IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| WINDMILL WELLNESS RANCH, L.L.C. | § § § | |
| *Plaintiff,* | § § § | |
| V. | § | Case No. 5:19-cv-1211 |
| | § | |
| BLUE CROSS AND BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORPORATION | § § § | |
| *Defendant.* | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Windmill Wellness Ranch, Inc. Plaintiff herein, and files this Original Complaint, complaining of Defendant, Blue Cross Blue Shield of Texas, a Division of Health Care Service Corporation, and for cause of action would show the Honorable Court the following:

I.

### Parties

2.      Plaintiff, Windmill Wellness Ranch, L.L.C. (hereinafter referred to as "Windmill" or "Plaintiff") is a Texas corporation, with its principal place of business in Canyon Lake, Comal County, Texas.

3.     Defendant, Blue Cross Blue Shield of Texas, a Division of Health Care Service Corporation (hereinafter referred to as "BCBS"), is in the business of providing and/or administering medical, health and behavioral health insurance plans and is licensed to do business in the state of Texas.  Defendant, BCBS, will be served by serving its registered agent for service, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, TX 78701-3218.

II.

**Jurisdiction and Venue**

4.     This case is within the subject matter jurisdiction of this Court pursuant to 29 USC §§ 1001, *et. seq.* of the Employment Retirement Income Security Act ("ERISA") and under 28 USC § 1331 (federal question jurisdiction) and under 28 USC § 1332 (diversity of citizenship).  Venue is proper and appropriately established in this Court under 28 USC § 1391, as the Defendant conducts a substantial amount of business in this District and a substantial part of the events, acts or omissions that give rise to the claims herein occurred in this Federal District.

III.

**Introduction and Factual Background**

5.     Windmill is a co-occurring inpatient and outpatient treatment center specializing in substance use disorders, trauma therapies, and mental health services that serves patients from all over the United States.  Windmill is licensed by the state of Texas as a Substance Abuse Treatment Facility, whereby the facility provides residential detoxification, intensive and supportive residential services and outpatient substance

abuse treatment services.  Additionally, Windmill is one of very few treatment centers that are designated by the State of Texas as a COSPD (co-occurring psychiatric disorders) facility.  In this regard, Windmill offers a full medical detoxification wing and also provides continuing and co-occurring treatment and medically necessary services to residents and patients, including but not limited to detoxification, inpatient, partial inpatient and outpatient care and depending on the level of care and specific clinical needs required by each patient.  Being a co-occurring treatment facility, Windmill not only provides treatment for substance abuse disorders (i.e. opiate, narcotics, cocaine, etc.) and behavioral addiction (gambling, food, etc.), but Windmill also provides behavioral and mental health treatment for underlying conditions, including but not limited to bi-polar disorders, major depressive disorders, PTSD, various forms of trauma, anxiety disorders and chronic pain.  Thus, the facility is not just a substance abuse facility, but is also fully staffed and equipped to properly diagnosis and treat co-occurring conditions with the proper modality of therapy or medication management.  Unlike most treatment facilities, Windmill provides effective treatments to residents and patients with mental health concerns in conjunction with the patients' substance abuse problems. Windmill is also accredited by the Joint Commission on Accreditation of Healthcare Organizations to provide behavioral and mental health services to its patients.  Windmill is equipped with a staff of 57 persons and can treat up to 52 persons with 52 licensed beds.  Windmill's staff is highly qualified and licensed.  Once a patient is admitted for care, the treating Clinician's and Physician's licensure require that they provide the necessary level of care to properly treat the patients, or otherwise risk censure or a loss of their license.

Windmill provides all services based on professional standards of medical care and bases all services on full medical assessment, evaluation and proper diagnosis of the patient. As a result, Windmill has an efficacy and effective treatment rate of over seventy percent (70%) due to the array and level of clinical services provided and the fact Plaintiff treats for co-occurring conditions.  There is not a facility in Central Texas or for that matter throughout Texas that provides the specialized services and high level of serviced and care that are provided at Windmill.

6.     It is well documented that mental health conditions and substance use disorders are prevalent and very serious health issues in the United States.  According to the Substance Abuse and Mental Health Services Administration ("SAMHSA"), approximately 20.3 million people aged 12 or older had a substance abuse disorder ("SUD") in 2018 related to the use of alcohol or illicit drugs and with an estimated 2 million people having an opioid disorder.  Likewise, an estimated 47.6 million (19.1%) of adults aged 18 and older had any mental illness ("AMI") in the past year.  In 2018, an estimated 11.4 million adults had a serious mental illness ("SMI") in the past year. Approximately 358,000 adolescents had a SUD and a Major Depressive Episode ("MDE") in the past year with 288,000 adolescents having a SUD with a MDE with severe impairment.  In 2018, an estimated 9.2 million adults aged 18 or older had both AMI and at least one SUD in the past year, and 3.2 million adults had co-occurring SMI and a SUD in the past year.  Importantly, substance use was more common among both adolescent and adults that had a mental health issue than among those that did not have a

mental health issue.  A large amount of persons that are in dire need of substance abuse treatment do not receive necessary treatment because of a lack of coverage.  When substance abuse disorders are inadequately treated, they can and do complicate care for co-occurring mental health disorders and mental conditions.  This is a critical fact since Windmill and the level of care it provides is unique.  Plaintiff is equipped and staffed to provide co-occurring treatment for addiction and mental and behavioral health and provides life-saving services daily.  Absent receiving appropriate care and treatment for addiction and related mental disorders, patients face serious healthcare consequences and even death.  As recently held by Federal District Judge Spero (in *David Wit, et. al v. United Behavioral Health*; Cause No. 14-cv-02346-JCS; In the United States District Court for the Northern District of California), "it is well established that effective treatment of mental health and substance abuse disorders includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

7.      In spite of these alarming statistics and the well publicized national crisis regarding opioid and drug abuse nationwide, Defendant and other insurance carriers continue to systematically and improperly deny necessary mental health and substance abuse-related benefit claims and/or refuse to pay or drastically underpay Plaintiff and like providers. These denials, refusals to pay and gross underpayments are based on specious and clinically unsupported internal policies and practices that not only violate the terms of the underlying health insurance plans, but also fly in the face of nationally recognized

treatment standards and the levels of care that are required to properly treat these complicated conditions.

8.     The denials, acts and omissions of BCBS in regards to the medical claims made the basis of this dispute additionally violate the Mental Health Parity and Addiction Equity Act of 2008 ("Federal Parity Act") and the equivalent Texas statutes found at the Texas Insurance Code, Section 1355.004 and 1368.002.  The Federal and Texas Parity Acts ("Parity Acts") provide that mental health and substance use disorders must be provided at the same level of benefits provided for physical illness.  Fully funded plans or fully insured plans (plans for which BCBS pays for benefits from its own assets and premiums received) are required to provide parity.  Likewise, self funded plans (plans for which BCBS administers the underlying ERISA plans and benefits are paid from assets of the group plan sponsor) that offer coverage for substance use disorder and mental health benefits (and for which valuable premiums are paid by members) must also provide parity to members.  In this regard, plans and insurance carriers are prohibited by state and federal law from denying coverage for medically necessary services or to otherwise apply quantitative or non-quantitative restrictions or limitations on coverage of medically necessary medical services relating to substance abuse and mental health services.  The unlawful motives of BCBS are apparent and clear - to deny and delay payment claims in order to realize a windfall of benefits by not paying for the often-high costs associated with treating addiction and chronic conditions in conjunction with co-occurring mental health services.

9.      Furthermore, any such coverage must be provided consistent with generally accepted clinical and medical standards of care.  The American Society of Addiction Medicine ("ASAM") has developed nationally and clinically recognized criteria for addiction treatment guidelines and coverage.   ASAM establishes and publishes these treatment and coverage guidelines, which are uniformly accepted by clinicians and providers for addiction, substance related disorders, mental health and co-occurring conditions for all levels of care. [1]

10.     Additionally, the Texas Insurance Code and the Texas Administrative Code set forth treatment guidelines relating to chemical dependency treatment centers that closely follow ASAM clinical guidelines.  See §3.8001 *et. seq*.  As an example, the Texas Administrative Code provides that the recommended length of stay for inpatient detoxification services is up to 14 days (§3.8010), the recommended length of stay for inpatient rehab/treatment is 14 to 35 days (§3.8014) and the recommended length of stay for partial hospitalization services is between 4-35 days.  Section 1355.004 provides that plans must provide coverage, based on medical necessity, for not less than 45 days of inpatient treatment for the treatment of serious mental illness in each calendar year.

---

[1] As also held by Judge Spero and equally applicable in the immediate case in *Wit, et. al v. United Behavioral Health*;  "Indeed, all of its (UBH's) clinicians recommend that the ASAM criteria be adopted.  The only reason UBH declined to adopt the ASAM criteria was that its finance department wouldn't sign off on the change".   Judge Spero went on to hold that UBH's internal guidelines for mental health and substance abuse coverage ignored generally accepted standards of care and focused on "crisis stabilization" rather than appropriate treatment necessary for the conditions.  "The court finds, by a preponderance of the evidence , that in every version of the guidelines in the class period, and at every level of care that is at issue in this case, there is an excessive emphasis on addressing acute symptoms and stabilizing crises, while ignoring the effective treatment of members' underlying conditions".  Judge Spero further held versions of the treatment guidelines of UBH at issue in the case are pervasive and result in a significantly narrower scope of coverage than is consistent with generally accepted levels of care. Not only do the guidelines in all relevant years contain provisions that improperly instruct clinicians to consider only safety and not effectiveness in deciding whether to move a patient to lower level of care; they also deviate from generally accepted standards of care by using language that strongly conveys to clinicians that they should err on the side of moving members to lover levels of care even where there is uncertainty about whether such a move is safe.

However, data relating to BCBS and patients admitted to Windmill demonstrably show that BCBS's coverage and clinical determinations consistently fall well short of the care necessary to properly treat BCBS members by all medical standards.  When compared to other major insurance carriers and payors, BCBS authorizes fewer level of care requests, and when care is actually authorized by BCBS, fewer days are approved.  Importantly, BCBS's allowed reimbursement for services provided to its own member falls well short of other major insurance carriers and payors based not only on the rates paid but the failure to extend coverage for medically necessary services.

11.    The reasons for this are apparent.  BCBS has adopted arbitrary and clinically unsupported internal "guidelines" and policies relating to treatment and coverage BCBS members, which BCBS utilizes in adjudicating, processing and underpaying claims, if not denying coverage completely.  BCBS's treatment guidelines are allusive, unclear, arbitrary, inconsistent and ever changing.  What is certain is that BCBS fails to follow established and recognized clinical guidelines for services provided to BCBS members.  This is the case although BCBS is legally obligated to conform with state and federal law, ERISA, Parity Acts, as well as BCBS's independent commercial, contractual, common law and statutory obligations to the Plaintiff as a commercial medical provider.  In ignoring these obligations, BCBS has systematically, knowingly and intentionally refused to authorize necessary medical services needed by BCBS members and has made benefit determinations that are inconsistent with the terms of the governing plans, ERISA and Parity laws.

12.     Nowhere does BCBS provide clear guidelines that relate to treatment for co-occurring mental health disorders, risk of relapse, motivation barriers, or any number of necessary clinical elements or data that are absolutely necessary to direct the proper care of BCBS members.  For that matter, the extent of coverage and reimbursement to be paid for the services or the members' responsibility is a complete mystery on a claim to claim basis   This is problematic for not only Windmill (as the provider of services), but also for the patient.  Windmill provides valuable service to BCBS members with the expectation of at least being paid reasonable rates for the high level of care provided to BCBS members.  When Windmill contacts BCBS to verify if benefits are available and to authorize the treatment of BCBS members, Windmill inquiries about the rates and benefits.   However, BCBS only generally states that it or the plan will pay the "Allowable Rate", whatever that may mean.   BCBS then remits ridiculously low reimbursement rates with absolutely no explanation for the basis of that payment rate. This of course always results in much higher patient responsibility and liability.  Only BCBS is in the position to know what will be paid and what BCBS's "Allowable Amounts" are for the services that are necessary to properly treat their members.  Yet, the rate of reimbrumsent is not known until well after the BCBS member receives urgent, immediate and often emergency medical care, all services for which BCBS represented the member had available and adequate coverage.  As example, BCBS may state after the fact that the insured member is responsible for 60% of the "eligible charges", but neither the member nor Windmill ever know the "Allowable Amount" until after the services are provided, and BCBS adjudicates and underpays the claim, or denies the claim altogether.

To date, BCBS has failed to provide any data or basis for how it determines "Allowable Amounts". In other instances, BCBS alleges it is applying what it refers to as MNRP (Maximum Non-Network Reimbursement Plan) as the alleged basis for the amount of reimbursement paid or the maximum allowable for out of network claims. Apparently, BCBS is somehow improperly applying some sort of Medicare based reimbursement methodology. The problem is that there are no comparable Medicare rates for the level of care and types of services being provided by Windmill. Medicare does not provide a rate for an inpatient residential treatment center. Rather, Medicare only covers inpatient mental health and substance use disorder treatments when rendered by a licensed Inpatient Hospital. Thus, Windmill is not a Medicare provider, and the services and level of care being provided by Windmill is not a Medicare covered service. BCBS is well aware of this. Yet, BCBS has in fact misrepresented to Windmill that specific plan documents contain this "MNRP" language that would somehow and otherwise limit BCBS or the plan's responsibility to pay adequate reimbursement for medically necessary and covered services. It is no surprise that when these plan documents were reviewed, there was no mention or reference to a "MNRP", much less a clear description of how the level of care and services provided by Windmill would be reimbursed by BCBS or the plan. Indeed, BCBS's methodology for how it calculates reimbursement for medically necessary and mandated services is purposefully a mystery. BCBS's reimbursement "rates" are arbitrary, capricious, and completely unsubstantiated. BCBS's coverage determinations and payment rates fail to meet the required coverage under the members' plans, Parity laws and completely fail to adequately compensate

Windmill for the valuable services provided to BCBS members.  Review of the claims made the basis of this disputes show that there is neither rhyme nor reason for how BCBS pays the claims, as payments are all over the place for like or similar services.  In fact, BCBS has paid many claims at higher rates, while drastically underpaying other claims for that very same BCBS member, but for different admissions.

13.   At all time relevant hereto, Windmill and BCBS were not party to a preferred provider contract, in spite of Windmill's best efforts through the years to contract with BCBS for reasonable reimbursement rates.  Thus, all the services provided to BCBS members made the basis of this dispute were out of network.  Again though, only Windmill was fully staffed and capable of providing the high level of services and co-occurring treatment necessary in the geographic region.  For each admission made the basis of this dispute, BCBS verified that benefits were available and adequate for the services and treatment being provided to the patients and those services were authorized.  Based upon these representations by BCBS, Windmill admitted and provided the necessary treatment and services to the patients with the certain expectation of reasonable payment.  Texas law is clear that a carrier is responsible for representations of benefits (as well as misrepresentation or the negligent misrepresentation of benefits or coverage that actually are not available).  Only the plan and its agents are in the position to determine eligibility and actual coverage, which is the very reason why providers contact plans or third-party administrators when the patient is admitted.  This is necessary to ensure that there adequate coverage in place to properly pay for the valuable medical

services.  The Texas Insurance Code also expressly provides that once benefits are verified and services are authorized by a plan, payment for the claim cannot be denied. However, BCBS has paid nothing for countless claims.  For those claims that were paid, reimbursement is minimal and wholly inadequate.  BCBS's adjudication of the over 4000 claims constitutes repeated violations of Federal and Texas law as described in detail below.  For the 4,110 claims made the basis of this dispute, the total aggregate charges are $13,101,675.00.  Excluding what BCBS alleges to be patient/member responsibility, BCBS has paid Windmill a paltry $1,047,161.00 or less than 8 % of the Windmill's usual and customary charges for the critical and often life saving services provided to BCBS members. The total "allowed" amount for all of the claims was a mere $1,496,160 (BCBS's payment of $1,047,161 and an additional patient/member responsibility of $449,000).

14.     To justify the ridiculous payment amounts, BCBS has set forth a myriad of unsupported reasons and denial codes for the failure to properly pay the claims, including but not limited to the following:  1) services are not covered by contract for this type of provider; 2) maximum benefit available for this service has been paid; 3) service not eligible - failed to meet group guidelines; 4) maximum benefit available for this service has been paid; 4) charge exceeds Medicare's allowed amount; 5) type of procedure done is not covered by this contract.  These are just a few of the improper and meritless examples that serve as the basis for BCBS's non-payment or underpayment of services provided to BCBS members.  For those claims where BCBS has not paid a single penny

for the valuable services, BCBS had an express statutory and common law duty to notify Plaintiff at the time of admission whether the services were not covered at all or whether coverage was somehow limited.  If the claims are not covered under the plan or if benefits were somehow limited contrary to otherwise established clinical standards and representations of coverage, BCBS had an express duty to notify Windmill that nothing would be paid or payment would be limited by the plan benefits or BCBS's internal policies.  Likewise, denying claims due to absence of notification or failure to preauthorize is equally groundless.  Plaintiff contacted BCBS to verify benefits and BCBS authorized the services.  Failure to pay a penny for these claims is tantamount to fraud. Further, misrepresenting coverage being available constitutes a deceptive trade practice in violation of the Texas Insurance Code as further shown below.

15.    For those claims where BCBS did at least remit some reimbursement for the claim(s), the level of payment is completely inadequate and does not meet any semblance of fair, usual or customary reimbursement for the very costly services being provided to BCBS members.  Presumably, BCBS believes that the provider and members should absorb the costs of care, rather than the BCBS or the plan that purports to provide coverage to those members.

16.    Paying nothing for countless claims and arbitrarily underpaying Plaintiff for valuable services serves only to financially benefit BCBS and the plans BCBS administers.  This also necessarily precludes BCBS members from having access to appropriate and mandated medical care.  As a result, BCBS discriminates against its own

members by failing to approve necessary care or pay an appropriate level of benefits and reimbursement for that care.  This effectually leaves the financial liability and obligation with the member and the provider, rather than the plans and BCBS.

17.    To the extent that BCBS may or has alleged that the services in question were not medically necessary or were not clinically justified, any such alleged grounds are without merit, unfounded and clinically unsupported.  The Parity Acts prohibit health plans that provide mental health or substance use disorder (MH/SUD) benefits from imposing less favorable benefit limitations on those benefits than would be imposed on medical/surgical benefits.  It is without question, the acts and omission complained of herein violate the Parity Acts, and there is no clinical basis for denying the claims based on medical necessity.

18.    As a result, BCBS and the plans has realized and reaped immeasurable benefits from the receipt of the premium payments for substance use and mental health coverage from their members, to only deny coverage for that care or underpay the claims. At the least, BCBS and the plans have been unjustly enriched in accepting these premiums, while not paying appropriate amounts for covered services provided to BCBS members or paying nothing at all.

19.    Plaintiff would also show that upon admission, all patient sign admission agreements, whereby the patients agree to be individually responsible for payment of the services, if the insurance does not pay.  Likewise, patients execute an Assignment of Benefits that assigns all rights and entitlement to the payment of benefits to the medical

provider.  Beneficiary status is thereby conferred upon the Plaintiff in this lawsuit, giving the Plaintiff legal standing to seek remedy under ERISA against BCBS and/or the health plans insuring the patients.  Plaintiff seeks entitlement to payment as an assignee for covered services under ERISA governed benefit plans, as well as payment for the benefits BCBS has denied.  Windmill brings its claims, in part, as an assignee of its residents/members against Defendant under ERISA, 29 U.S.C. § 1132(a) and § 502(a) to recover for wrongfully denied benefits, the refusal to approve and pay reasonable reimbursement for medically necessary services due to application of illegal policies, guidelines and practices, which deprived BCBS members of having access to necessary care and while also hanging the financial responsibility of that care upon its own members.

20.    In addition to these ERISA claims, Plaintiff also maintains and seeks independent legal remedies and causes of action herein against Defendant as a medical provider under applicable Texas and Federal law statute and common law and as set forth below.

21.    For the purpose of the numerous patients' privacy rights, the names and identification numbers are not included in this pleading for the 4,110 claims made the basis of this dispute.  Sufficient information has already been or will be provided to Defendant, such that Defendant is duly notified of all the claims.  Further information will be provided, if necessary, to identify the individual claims in question and/or the specific claim information will be provided to this Court under seal.

**IV.**

**CAUSES OF ACTION**

**A)**   **ERISA CLAIMS**

22.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 5 through 21 as if fully set forth herein.

**i)**   **Failure to Comply with Plans of Beneficiaries and Breach of Fiduciary Duties under ERISA by denying or underpaying claims.**

23.     As described above, the Plaintiff provided covered and medically necessary to BCBS members that either had insurance that was fully funded by BCBS or had health benefit plans that were administered by BCBS.  By making benefit determinations and developing internal practices and policies that are applied to claim and benefit determinations, Defendant is an ERISA fiduciary.  As an ERISA fiduciary, BCBS owed Plaintiff and BCBS members fiduciary duties, including but not limited to making decisions in accordance with insurance plan terms, ERISA and the Parity Acts.

24.     BCBS has denied or underpaid over 4000 medical claims for benefits for services provided to BCBS members. On information and belief, the members (or the member's employer) paid health insurance premiums to ensure that covered services and benefits would be paid to Plaintiff and for the benefit of BCBS members that received these medical services.  BCBS has denied or refused to approve necessary care by developing and applying internal practices and policies that restrict coverage in contravention of the health plans, ERISA and Parity laws and all established clinical

guidelines. These practices and policies ignore established industry standards and the levels of care necessary for the effective treatment of BCBS members at Windmill.

25. As an assignee of BCBS members, Plaintiff brings these claims to enforce the terms of various health benefit plans, whereby BCBS has arbitrarily denied the claims, paid Plaintiff absolutely nothing, or drastically underpaid 4000 claims for valuable medical services. Under § 502(a) of ERISA, Plaintiff (as an assignee and beneficiary) is legally entitled to recover benefits for medical services that are due to Plaintiff and/or the BCBS members under the terms of the plans between BCBS, the health benefit plans, and the patients treated. Plaintiff is also entitled to enforce the rights as an assignee under the terms of the applicable plans.

26. Likewise, and as the assignee of ERISA members, the Plaintiff is entitled to seek and assert claims for relief against BCBS for its breach of fiduciary duties of loyalty and care owned to the members under 29 USC § 1132(a)(3). At all times relevant hereto, BCBS acted as a fiduciary to the beneficiaries, as BCBS exercised discretion, authority and control in determining whether plan benefits would be paid to the Plaintiff. BCBS denied and failed to pay a single penny in benefits for countless claims for medically necessary services provided to BCBS members. BCBS violated ERISA as a fiduciary in failing to pay for covered services and failing to provide the Plaintiff and/or the patients with all rights under the terms of the plans covering the patients. BCBS has thus further breached the ERISA imposed duty of loyalty, by failing to act with care, diligence and prudence or act in accordance with the documents that govern the plan insuring the patients. BCBS has breached its duty of care as a fiduciary by failing to act in the interest

of the insured patients and by failing to provide benefits to the plans' members for medically necessary services.

27.    BCBS further breached the terms of the governing health benefit plans by arbitrarily denying payment for medically necessary and covered medical services and by making claim determinations that paid less than was required under the plans without legal, clinical or factual basis.

28.    BCBS has additionally violated its duties by determining that no benefits or limited benefits would be paid.  Such an exercise of discretion and the determination made by BCBS to pay absolutely nothing or next to nothing for the services provided failed to meet the terms of the governing health benefit plans and resulted in BCBS and/or the plans realizing a financial windfall.  Such self dealing for the benefit of the fiduciary was at the expense of the plan beneficiaries, thereby violating ERISA §§404(a)(1)(B) and (D) as well as ERISA §§ 1104(a)(1)(B) and (D).

29.    As a result, Plaintiff has been damaged in the amount of the balance of its usual and customary charges for the services provided to the BCBS members in the amount of $11,605.515.00.

**ii)     Failure to Provide Full and Fair Review**

30.    Plaintiff incorporates by reference the allegations set forth in paragraphs 5 through 29 as if fully set forth herein.

31.    BCBS functions as a plan administrator within the meaning of ERISA when it fully insures group health plans or when it is designated or acts as the

administrator for such plans with the discretion accorded to a plan administrator.  Thus Plaintiff, as assignee, is entitled to assert claims for relief under 29 § 1132(a)(3).

32.     BCBS has failed to provide a full and fair review and has failed to make necessary disclosure pursuant to 29 USC § 1133 and its regulations.

33.     As a result, Plaintiff has been damaged in the amount of the balance of its usual and customary charges for the services provided to the patients in the amount of $11,605.515.00.

### iii)     Claims Procedure Violations

34.     Plaintiff incorporates by reference the allegations set forth in paragraphs 5 through 33 as if fully set forth herein.

35.     BCBS is an insurance company that is subject to regulation under the laws of more than one state, including the State of Texas.  BCBS also processed benefits and claims for self funded plans by providing claim filing information and notices of decisions to policy holders.  Thus, BCBS is required to comply with the claim procedures for members as provided for under law.  *See example* at 29 CFR § 2560.503-1.  BCBS violated claim procedure regulations by engaging in conduct that rendered its claim procedures and appeals process unfair to plan members.  Plaintiff, as assignee of said members, is entitled to relief under 29 USC § 1132(a)(3).

36.     As a result, Plaintiff has been damaged in the amount of the balance of its usual and customary charges for the services provided to the patients in the amount of $11,605,515.00.

**B)**   **STATE LAW CLAIMS**

37.     Plaintiff incorporates by reference the allegations set forth in paragraph 5 through 36 as if fully set forth herein.

**iv)**   **Quantum Meruit and Unjust Enrichment**

38.     Plaintiff provided valuable medical services to members insured by BCBS. BCBS has completely denied or drastically underpaid 4,110 claims for medical services provided to BCBS members.  Plaintiff provided those valuable medical services in good faith with the certain expectation of payment.  All medical services were provided for the benefit of the Defendant's members, as well as BCBS.  BCBS knew or should have known that the Plaintiff expected appropriate payment.  As a result, Plaintiff is entitled to recover a reasonable value for the services, supplies and costs provided to the Defendant's members.

39.     As a result, Plaintiff has been damaged in the amount of the balance of its usual and customary charges for the services provided to the patients in the amount of $11,605,515.00.

**v)**   **Breach of Contract**

40.     Plaintiff incorporates by reference the allegations set forth in paragraph 5 through 39 as if fully set forth herein.

41.     As described above, the Defendant authorized the services and necessarily agreed to pay for medical services and care provided by Plaintiff to BCBS members.  The Plaintiff contacted the Defendant when the patients were admitted, and Defendant represented coverage was available and authorized the services to be provided.  Said

services were provided and the Defendants have failed to pay amounts that are due and owed.  Defendant's non-performance in failing to pay any monies or failing to pay a reasonable rate for the claims constitutes a material breach of the parties' agreements. Alternatively, the parties entered into an implied-in-fact contractual agreement, which can clearly be inferred from the industry standards described above, the parties conduct, and the surrounding circumstances involved for these multiple admissions.

42.     Thus, Plaintiff has been damaged in the amount of the balance of its billed usual and customary charges, in an aggregate amount of $11,605,515.00.  All conditions precedent to Defendant's obligations of payment have occurred as required by the Texas Rules of Civil Procedure.

vi)     <u>**Negligence and Negligent Misrepresentations**</u>

43.     The Plaintiff alleges and incorporates herein by reference paragraphs 5 through 42 above.

44.     The Plaintiff would show it is the accepted business practice in the healthcare industry to contact insurers or their administrators and verify coverage for patients being admitted.  Since coverage and benefit information is within the exclusive control of the insurer or its administrator, a provider must rely on representations of coverage by an insurance carrier or its agents or administrators when deciding to admit and provide valuable service to a patient.  Insurance carriers and/or a plan administrator know a provider will rely on assertions of coverage and are under a statutory and

common law duty to reasonably investigate coverage and provide a provider with accurate information.

45.    In the cases made the basis of this proceeding, the Plaintiff contacted BCBS upon each admission and BCBS verified benefits were available and authorized the medical treatment provided to each patient.  The Plaintiff relied on these representations in admitting and providing medical services to the patients and expected certain payment. BCBS knew or should have known if there was available coverage upon admission and the extent of that coverage.  Yet, BCBS has completely denied or grossly underpaid 4,100 claims on various unsupported and improper bases contrary to actual representations of coverage and benefits that were made when the BCBS members were admitted.  BCBS has breached its duties to the Hospitals to provide accurate information regarding coverage and/or authorization of the services by not paying the Plaintiff at all or paying at such unreasonably low rates, such that the Plaintiff has been damaged.

46.    The Texas Insurance Code § 1301.135(f) states, "If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care unless the physician or provider has materially misrepresented the proposed medical or health care services or has substantially failed to perform the proposed medical or health care services."  BCBS has not and cannot allege Plaintiff materially misrepresented the services required to be provided to the patients or that Plaintiff failed to perform said services.  The purpose of verification and obtaining

authorization is to confirm valid insurance coverage, or the lack thereof. BCBS therefore, knew or should have known that Plaintiff would rely on that verification and authorization and, thus, any denial of this claim should be estopped per the Insurance Code regulations and under common law. Further and regardless of what the underlying plans state, BCBS's violation of the insurance code requires them to pay this claim as billed.

47.     As a direct and proximate cause, the Plaintiff has been damaged in the aggregate amount of the balance of the Plaintiff's usual and customary charges incurred for the medical services provided in the amount of $11,605,515.00.   The Plaintiff likewise seeks exemplary and punitive damages as a result of the misrepresentations, acts and omissions complained of herein and to be determined by the trier of fact.

### vii).    PROMPT PAY VIOLATION: CAUSE OF ACTION FOR VIOLATION OF TEXAS INSURANCE CODE § 1301.101 *et seq.*

48.     The Plaintiff alleges and incorporates herein by reference paragraphs 5 through 47 above.

49.     BCBS failed to timely and appropriately pay or deny thousands of claims as required by the prompt payment provisions of the Texas Insurance Code.

50.     The Texas Insurance Code § 1301.069 states that "The provisions of this chapter relating to prompt payment by an insurer of a physician or health care provider and to verification of medical care or health care services apply to a physician or provider who:

            (1)   is not a preferred provider included in the preferred provider network; and

            (2)  provides to an insured:

                (A)   care related to an emergency or its attendant episode of care as required by state or federal law; or

                (B)   specialty or other medical care or health care services at the request of the insurer or a preferred provider because the services are not reasonably available from a preferred provider, who is included in the preferred delivery network.

51.    Plaintiff is not is not a member of a BCBS preferred provider network. Plaintiff provided emergency, urgent and/or specialty medical care for the benefit of BCBS members.  Plaintiff requested and received authorization for the services provided to BCBS members.  Plaintiff submitted clean claims for proper payment of the services. BCBS either funds the plan or acts as the third-party administrator of the plan subject to the Texas Insurance Code per Tex. Ins. Code Ann. § 1301.109 and § 1301.138 (Vernon 2005). The Texas Insurance Code § 1301.103 *et seq*. requires that an insurer pay, in whole or in part, or deny a clean claim "not later than the 45th day after the date an insurer receives a clean claim…".   The claims have been completely denied or grossly underpaid.  BCBS' has clearly failed to make a determination on this claim within the applicable statutory time-frame.

52.    BCBS's failure to timely pay or deny these claims subjects BCBS to prompt payment penalties. The applicable penalty for violation of the applicable prompt

payment provisions is payment of the submitted billed charges plus 100% of the difference between the billed charges and the contracted rate and 18% interest from the date payment or denial was due. Tex. Ins. Code Ann. § 1301.137(c) (Vernon 2005).

### vii)   Violations of the Texas Insurance Code through Deceptive and Unfair Trade Practices

53.   Plaintiff alleges and incorporates herein by reference paragraphs 5 through 52 above.

54.   Plaintiff would show it is the accepted business practice in the health care and industry to contact insurers and/or plan administrators in order to verify coverage for patients that are being admitted for medical services.  Providers also seek to pre-certify or preauthorize the medical services with the carrier to insure the anticipated medical procedures or services are authorized by the plan and indeed covered.  These steps are the only way a medical provider can ensure payment will be made by a plan prior to providing costly and valuable medical services.

55.   Coverage and benefit information is entirely within the exclusive control of the insurer or its administrator.  A provider must thus rely on representations of coverage by a carrier (or its agents or administrator) when deciding to admit and treat a patient. Carriers and plan administrators know a provider will rely on assertions and representations of coverage and are under a legal and affirmative duty to reasonably investigate and provide accurate coverage information to providers.

56.   BCBS verified benefits and authorized each admission for the BCBS members made the basis of this dispute.  BCBS represented benefits were available and preauthorized each service.  The Plaintiff provided the necessary services and treatment to the patients in reliance on these assertions and representations of available insurance coverage, and with the understanding the Plaintiff would be paid.  Plaintiff has no way to determine the existence of insurance coverage and benefits except through the plan and/or its administrators.  Plaintiff provided the medical services in reliance on said representations and with the certain expectation of payment.  The Texas Insurance Code §1301.135(f) also states "if an insurer has preauthorized medical care or healthcare services, the insured may not deny or reduce payment".  Yet in this case, BCBS again and again denied or grossly underpaid for services provided to these BCBS members on various unsubstantiated grounds.

57.   As a result, Plaintiff has been directly damaged and harmed as a result of BCBS misrepresenting the terms of available coverage.   Due to these acts and/or omissions that result from BCBS's misrepresentations, misleading statements, indifference or negligence, and the conduct complained of herein, BCBS has caused harm and damage to the Plaintiff.  The conduct of BCBS also constitutes a deceptive trade practice in violation to the Texas Insurance Code, §541.001 *et seq*. due to BCBS misrepresenting the terms and coverage of the given health plans.  As a result, the Plaintiff seeks the full balance of its usual and customary charges of $11,605,515.00. Since this conduct was committed systematically and knowingly, Plaintiff also seeks and

is entitled to three times the actual damages pursuant to the Texas Insurance Code §541.152.

    **ix)**    <u>**Fraud**</u>

58.    Plaintiff alleges and incorporates herein by reference paragraphs 5 through 21 above.

59.    As set forth above, the Defendant was aware that Plaintiff would rely on the representations made to the Hospital regarding the insurance coverage of each of the admitted patients.  The representations of coverage were false and material, and the Defendant either knew the representations to be false or made the representations recklessly as a positive assertion without the knowledge of its truth.  The representations were made with the intent that the Plaintiff act on the same, and indeed the Plaintiff did rely on the representations of insurance coverage in providing the costly and valuable medical services to BCBS members.  As a result, the Plaintiff has been harmed by the multiple and repeated misrepresentations of coverage and denials and/or underpayments for the valuable services provided.  Plaintiff would further show that the Defendant failed to disclose material facts to the Plaintiff regarding the patients' insurance coverage, to wit that there allegedly was no coverage at all for some patient or that the actual benefits and coverage of the members was completely inadequate to properly reimbrumsent the Plaintiff for the valuable services provided to BCBS members.  The Defendant had a duty to disclose those facts, and the facts were material.  The Defendant knew that the Plaintiff had no opportunity to discover the facts regarding any alleged limitations as to the

insured patients' coverage, specifically that the there was no coverage or benefits for the medically necessary services or that payment and reimbursement for the services would be inadequate. Plaintiff has been injured as a result of acting without the knowledge of the non-disclosed acts and information, and has been damaged in the amount of $11,605,515.00.

60.    Further and as a result of the conduct and omissions described above, the Plaintiff seeks exemplary damages in an amount to be determined by the trier of fact.

## Attorney's Fees

61.    Plaintiff has presented its claims for payment to Defendant for the above mentioned services rendered to the patients.  Defendant has failed to tender payment of the just amount owed to Plaintiff before the expiration of thirty (30) days from the date of demand.  Accordingly, Plaintiff is entitled to reasonable attorney's fees to be determined by the trier of fact pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, *et seq.*  as well as Texas Insurance Code §§ 1301.108 and 843.343.

## Jury Demand

62.    Plaintiff demands a trial by jury of all issues and causes of action so triable pursuant to the Federal Rules of Civil Procedure.

**Prayer**

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendant be cited to appear and answer herein, and after a trial on the merits, the Court enter judgment against the Defendant as follows:

1.      Judgment in the amount of $11,605,515.00 representing the actual damages and economic loss caused by the Defendant;

2.      Damages as allowed by Texas Insurance Code, Section 541.152;

3.      Exemplary damages to be determined by the trier of fact;

4.      Pre-judgment and post-judgment interest as allowed under the law;

5.      Attorney's fees to be determined by the trier of fact and costs of court; and

6.      Such other and further relief to which Plaintiff may show itself justly entitled.

Respectfully submitted,

LAW OFFICES OF P. MATTHEW O'NEIL

By      _____/s/ P. Matthew O'Neil_____
P. MATTHEW O'NEIL
State Bar No. 00795955
6514 McNeil Dr.
Bldg. 2, Suite 201
Austin, Texas 78729
(512) 473-2002 Telephone
(512) 473-2034 Facsimile

HOLLAWAY & GUMBERT

By       /s/ T. Daniel Hollaway
      T. Daniel Hollaway
      State Bar No.: 09866700
      8225 Westglen Drive
      Houston, Texas 77063-6307
      Telephone: (713) 942.7900
      Facsimile: (713) 942.8530

ATTORNEYS FOR PLAINTIFF,
WINDMILL WELLNESS RANCH