IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| WINDMILL WELLNESS RANCH, L.L.C. | § § | |
| *Plaintiff,* | § § | |
| V. | § § | Case No. 5:19-cv-1211-OLG |
| BLUE CROSS AND BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORPORATION | § § § § | |
| *Defendant.* | § | |

## PLAINTIFF'S FIFTH  AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Windmill Wellness Ranch, LLC., ("Windmill") plaintiff, which files this, its Plaintiff's Fifth Amended Original Complaint for itself and additionally in the name of the several medical patients whose medical claims are at issue in this action. These individuals all sought and received treatment at Windmill, and they are also insureds and/or beneficiaries of health plans marketed, insured and/or administered by the several Blue Card plans named herein as defendants. These individual patients/plan beneficiaries will be collectively referred to herein as "Patients".  Each of these individual patients appointed Windmill as their personal representative to pursue administrative appeals, and to bring a lawsuit, if necessary, to secure health plan benefits for the care received during admissions to Windmill.[1] These individuals are identified by their initials in Exhibits 1 through Exhibit 18, attached hereto. These same exhibits also group Patients with their respective health

---

[1] 29 CFR § 2560.503-1(a)(4); The claims procedures do not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination.

plan and each of the Patients is identified by their initials and their unique Blue Card Subscriber ID Number. Each Blue Card entity can readily identify each pf the Patients with their Subscriber ID Number.

1.    Windmill and Patients bring this action complaining of certain out-of-state Blue Cross and Blue Shield entities in their respective capacities as plan sponsors[1], plan administrators or claim administrators of health insurance plans and/or employee welfare benefit plans, to the extent a "plan" exists in express terms beyond the bare purchase of health insurance from the below named Blue Cross and Blue Shield entities, or any of their subsidiary or affiliate entities. Windmill and Patients also bring this action against the named defendants, all of which are affiliates and/or franchisees of the Blue Cross Blue Shield Association, collectively referred to herein as "Blue Card" plans , in connection with their roles as  the insurer and/or administrator of health insurance and health plan products; and administrative services for individuals and/or employers not subject to ERISA. As grounds for their complaints and causes of action, plaintiffs would most respectfully show this Honorable Court the following:

## I.

## Parties

2.    Plaintiff, Windmill Wellness Ranch, LLC (hereinafter referred to as ("Windmill") is a Texas limited liability company with its principal place of business in Canyon Lake, Comal County, Texas.

3.    "Patients" are those individuals that are (or were) insureds and/or beneficiaries of the Blue Card health plans named as defendants in this action, who are

listed within Exhibit 1 through Exhibit 18 to this complaint.

4.      Defendant, Blue Cross and Blue Shield of Alabama is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members that were treated at Windmill's facility. It has  been served with summons and complaint, has appeared herein in this action, and this Complaint is being served upon its counsel of record.

5.      Defendant, Horizon Blue Cross and Blue Shield of New Jersey is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included a patient and member treated at Windmill's facility.  It has  been served with summons and complaint in this action, has appeared herein, and this Complaint is being served upon its counsel of record.

6.      Defendant, Blue Cross and Blue Shield of South Carolina is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included a patient or member that was treated at Windmill's facility. It has  been served with summons and complaint in this action, has appeared herein, and this Complaint is being served by serving its counsel of record.

7.      Defendant, Blue Cross and Blue Shield of Florida, Inc., d/b/a Florida Blue, is (or was at times relevant to this action), the primary insurer of patients and members

treated at Windmill's facility. On information and belief, members and patient purchased qualified health plans individually from Florida Blue. Blue Cross and Blue Shield of Florida, Inc. has been served with summons and complaint in this action, has appeared herein, and this Complaint is being served on its counsel of record. .

8.    Defendant, Empire Health Choice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield  which had been inadvertently misnamed and misidentified as Anthem New York in Plaintiff's Third Amended Complaint  is (or was at times relevant to this action) the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients treated at Windmill's facility. Empire Health Choice Assurance, Inc. previously misnamed as Anthem New York  has appeared herein and has been served with summons and complaint, and this Complaint is being served by serving its counsel of record; however, plaintiffs will serve this party with summons if its counsel refuses to accept service of this Plaintiff's Fifth Amended Original Complaint on its behalf.

9.    Defendant, Premera Blue Cross, is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility. Premera Blue Cross C   has been served with summons and complaint in this action, has appeared herein, and this Complaint is being served upon its counsel of record.

10.    Defendant, Highmark, Inc. is (or was at times relevant to this action), the

primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employeesand enrolled dependents of employer groups that are located in Pennsylvania and Delaware and  West Virginia and that include patients or members treated at Windmill's facility.  Highmark, Inc.  has been be served with summons and complaint in this action, has appeared herein, and this Complaint is being  served on its counsel of record; however, plaintiffs will serve this party with summons if its counsel refuses to accept service of this Plaintiff's Fifth Amended Original Complaint on its behalf.  .

11.    Defendant, CareFirst of Maryland, Inc. is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members from Maryland that were treated at Windmill's facility. CareFirst of Maryland, Inc. has been served with summons and complaint in this action, appeared herein, and this Complaint is being served on its counsel of record; however, plaintiffs will serve this party with summons if its counsel refuses to accept service of this Plaintiff's Fifth Amended Original Complaint on its behalf.

12.    Defendant, Blue Cross of California is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility.  Blue Cross of California  has been served with summons and complaint in this

action, has appeared herein, and this Complaint is being served on its counsel of record.

13.    Defendant, Blue Advantage Administrators of Arkansas d/b/a Arkansas Blue Cross Blue Shield is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members from Arkansas that were treated at Windmill's facility. Blue Advantage Administrators of Arkansas and/or Arkansas Blue Cross Blue Shield has been served with summons and complaint in this action, has appeared herein, and this Complaint is being served by serving its counsel of record;

14.    Defendant, Blue Cross Blue Shield of North Carolina is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility. Blue Cross and Blue Shield of North Carolina has been served with summons and complaint in this action and appeared herein and this Complaint is being served by serving its counsel of record.

15.    Defendant, Blue Cross Blue Shield Massachusetts, Inc. is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's. Blue Cross and Blue Shield of Massachusetts, Inc. was served with summons and complaint in this action, has appeared herein, and this Complaint is being

served on its counsel of record.

16.     Defendant, Blue Cross Blue Shield Kansas, Inc. is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility.  Blue Cross and Blue of Kansas, Inc. was  served with summons and complaint in this action, has appeared herein and is being served by serving its counsel of record.

17.     Defendant, Highmark Blue Cross Blue Shield Delaware, Inc. is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility.  Highmark Blue Cross Blue Shield Delaware, Inc. was  served with summons and complaint in this action, has appeared herein and this Complaint is being served on its counsel of record.

18.     Defendant, Blue Cross of Idaho Health Service, Inc. is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility.  Blue Cross of Idaho Health Services, Inc. was  served with summons and complaint in this action, has appeared herein and is being served by serving its counsel of record.

19.     Defendant, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross

Blue Shield, which was misnamed or misidentified as Anthem Blue Cross Blue Shield Virginia in Plaintiff's Third Amended Petition, is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility. Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross Blue Shield was served with summons and complaint in this action, has appeared herein, and this Complaint is being served by serving its counsel of record; however, plaintiffs will serve this party with summons if its counsel refuses to accept service of this Plaintiff's Fifth Amended Original Complaint on its behalf.

20.     Defendant, Alliance Life Insurance Company d/b/a Anthem Blue Cross Blue Shield in Missouri, which was inadvertently misnamed or misidentified as Anthem Blue Cross Blue Shield Missouri St. Louis in Plaintiff's Third Amended Complaint, is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility.   Alliance Life Insurance Company d/b/a Anthem Blue Cross Blue Shield in Missouri has been served with summons and complaint in this action, has appeared herein and is being served by serving its counsel of record; however, plaintiffs will serve this party with summons if its counsel refuses to accept service of this Plaintiff's Fifth Amended Original Complaint on its behalf.

21.     Defendant, Community Insurance Company d/b/a Anthem Blue Cross Blue

Shield, which was misidentified or misnamed as Anthem Blue Cross Blue Shield Ohio in Plaintiff's Third Amended Complaint , is (or was at times relevant to this action), the primary insurer or the claim administrator of a health insurance policy or employee welfare benefit plan established for the benefit of employees and enrolled dependents of employer groups that included patients and members treated at Windmill's facility.    Community Insurance Company d/b/a Anthem Blue Cross Blue Shield has  been served with summons and complaint in this action, has appeared herein and is being served by serving its counsel of record; however, plaintiffs will serve this party with summons if its counsel refuses to accept service of this Plaintiff's Fifth Amended Original Complaint on its behalf.  II.

## Jurisdiction and Venue

22.    This case is within the subject matter jurisdiction of this Court pursuant to 29 U.S.C. §§ 1001, *et. seq*. of the Employment Retirement Income Security Act ("ERISA"), 28 U.S.C. § 1331 (federal question jurisdiction) and under 28 U.S.C. § 1332 (diversity of citizenship). Venue is proper and appropriately established in this Court under 28 USC § 1391(b)(2), as the named defendants have members that (i) reside in this Federal District, (ii) routinely conduct business in this District through Blue Cross Blue Shield of Texas acting as their agent in Texas, and (iii) a substantial part of the events, acts or omissions that give rise to the claims herein occurred in the Western District of Texas.

23.    In addition to jurisdiction under 28 USC §§ 1331 and 1332, the Court has pendent jurisdiction of other, associated claims under 28 U.S.C. § 1367, which allows this Court to hear state-law claims asserted against a party when they are closely related to a

federal claim against a different party, even though the court may lack independent subject-matter jurisdiction over the state-law claim. Under 28 U.S.C. § 1367, a federal district court may exercise supplemental jurisdiction over state-law claims that the court would not otherwise have subject matter jurisdiction to hear, as long as the claims are part of the same case or controversy as the claims over which the court has original jurisdiction.

## III.

## Introduction and Factual Background

24.    Windmill is a co-occurring inpatient and outpatient treatment center specializing in substance use disorders, trauma therapies, and mental health services that serves patients from all over the United States. Windmill is licensed by the state of Texas as a Substance Abuse Treatment Facility, whereby the facility provides residential detoxification, intensive and supportive residential services, and outpatient substance abuse treatment services. Additionally, Windmill is one of very few treatment centers that are designated by the State of Texas as a COSPD (co-occurring psychiatric disorders) facility. In this regard, Windmill offers a full medical detoxification wing and provides continuing and co-occurring treatment and medically necessary services to residents and patients, including but not limited to, detoxification, inpatient, partial inpatient and outpatient care, depending on the level of care and specific clinical needs required by each patient. Being a co-occurring treatment facility, Windmill not only provides treatment for substance abuse disorders. (*e.g.*, opiates, narcotics, cocaine, etc.), and behavioral addiction, (*e.g.*, gambling, food addictions, eating disorders, etc.), Windmill also provides behavioral and mental health treatment for underlying conditions, including bi-polar disorders, major depressive disorders, PTSD, various forms of trauma, anxiety disorders and chronic pain. Thus,  the

facility is not just a substance abuse facility but is fully staffed, accredited and equipped to properly diagnose and treat co-occurring conditions with the proper modality of therapy and/or medication management. Windmill is accredited by the Joint Commission on Accreditation of Healthcare Organizations to provide behavioral and mental health services to its patients.

24.    The claims in dispute in this lawsuit, as initially filed, involved approximately 83 different BCBS plans and/or employer plans.  Suit was first filed only against Blue Cross Blue Shield of Texas, a Division of Health Care Services Corporation. Once a scheduling order was in place,  Windmill served initial discovery on BCBS of Texas.  After receiving some responsive discovery and in discussions between counsel, it was determined that many of the patients had insurance through out of state BCBS plan, rather than BCBS of Texas and/or self-funded health plans that were administered by non-HCSC, BCBS entities.  These out of state plans are often referred to as "Blue Card" plans or the "Home Plans".  However, each Blue Card plan is a member of the Blue Cross Blue Shield Association, which designed, and which maintains a network of all Blue Card entities that are licensees of the Blue Cross Blue Shield Association. It can be difficult at times to discern the true corporate identity of the responsible health plan, payor plan, or Home Plan, as claims for services provided in Texas by facilities located in Texas are always re-priced and adjudicated by Blue Cross Blue Shield of Texas. This has been the case for every claim at issue in this lawsuit, even though the responsible plan or "Home Plan" is an out of state Blue Card plan.  This is demonstrated by the remittance reports or "Explanation of Benefits" issued by Blue Cross Blue Shield of Texas, which always acts as

the Texas-based agent the out of state Home Plan. The actual corporate identity of the actual Home Plan is almost always concealed and not mentioned on remittance advices issued by Blue Cross Blue Shield Texas on behalf of out-of-state Blue Card plans. As a result, it is often unclear to a medical care provider which plan members' claims included in this lawsuit were insured or administered by Blue Cross Blue Shield Texas, a Division of Health Care Service Corporation, as opposed to a patient that was insured by an out-of-state Blue Card plan that is not a Division of Health Care Service Corporation, the corporation that owns and operates Blue Cross Blue Shield of Texas and Blue Cross Blue Shield of Illinois. The one thing that is clear to Windmill and Patients at this point is that, without exception, Blue Cross Blue Shield of Texas acted as the agent for every Blue Card plan named in this lawsuit.

25.     In response to discovery that was previously served on Blue Cross Blue Shield Texas, a Division of Health Care Service Corporation by Windmill, it was disclosed which claims for services were either insured or administered by a plan owned by Health Care Service Corporation and which were not, and by elimination, which were claims for members of out-of-state Blue Card plans.

26.     Once responsive discovery was provided by Blue Cross Blue Shield Texas, Windmill was  able to determine which plans were out of state Blue Card plans and which were Blue Cross Blue Shield Texas plans.

27.     27.On September 10, 2021, Windmill  then  filed an Agreed Stipulation of Dismissal with Prejudice as to those claims which involved Blue Cross Blue Shield of

Texas and those of any plan owned and/or operated by Health Care Service Corporation, *i.e.*, Blue Cross Blue Shield of Texas, Oklahoma, New Mexico, and Montana.

28.    In due order of pleadings, Windmill then filed a Motion for Leave to file its Fifth  Amended Original Complaint to address those claims remaining in this lawsuit that involve out-of-state Blue Card plans.  The Blue Card plans remain  necessary parties to this litigation on numerous grounds as shown herein.  Although Blue Cross Blue Shield of Texas adjudicated these claims, on information and belief, the Blue Card plans provide the actual insurance coverage, or served as the third-party claim administrator for the underlying employee health benefit plan, not Blue Cross Blue Shield of Texas.  Further and as shown below, Blue Cross Blue Shield of Texas represented to that it did not have access to the actual Blue Card plans and did not produce any in its discovery responses.  Thus, while Windmill did obtain copies of some "Plan Documents" for Blue Cross Blue Shield of Texas, Oklahoma, New Mexico and Montana, no plan documents were produced for the Blue Card plans named in its Fifth Amended Original Complaint.

## IV.

## <u>Verification of Benefits and Authorizations to Provide Services</u>

29.    All named Blue Cross Blue Shield entities (collectively referred to herein as "Blue Card Plans") are in the business of marketing and selling health insurance and/or administering healthcare benefit plans to certain employers, associations and/or individuals. At all times relevant hereto, Windmill was not contracted via a preferred provider agreement or network agreement with any of the Blue Card Plans. As a result, services provided to the patients that received care at Windmill, the claims for which are made the

basis of this lawsuit, are considered out-of-network. It should be noted that when providers are contracted with BCBS of Texas, and services are provided to out of state or Blue Card members, providers are contractually bound to provide services to out of state members and agree to accept the Texas contracted rates.  In the instant case, Windmill was out of network.  For this reason, it is the routine and customary business practice of Windmill to contact BCBS (or any other health insurance company) prior to, or upon a prospective patient presenting to the facility seeking treatment for substance abuse, addiction, or mental disorders. Often, these patients present in urgent conditions and are in immediate need of care. For each prospective patient that identified themselves as a BCBS member, Windmill personnel called or contacted the BCBS entity to confirm with certainty whether the patient had out of network benefits available for the services being sought, what categories of medical services were covered, and the extent of that coverage. Windmill also inquired about  precertification requirements and sought preauthorization for the services, if required.  Windmill provided Patients  differing levels of care, from Detoxification (DTX), Residential Treatment (RTC), Partial Hospitalization (PHP) and Intensive Outpatient Program (IOP) care depending on their condition, diagnosis and medical needs.

30.    Upon admission, Windmill also inquires specifically about the rates that will be paid for its services. Windmill asks whether BCBS and/or the plan will pay Usual and Customary Rates ("UCR") for out of network benefits and services.  If not, Windmill specifically requests  a description of the benefits available under a given patient's health insurance policy or employee welfare benefit plan to determine the method and measure of reimbursement it can expect to be paid, and a means of calculating the patient's financial

liability. For the claims made the basis of this suit, the Blue Card plans  provided  varying representations of what would be paid for services provided to the members, even at times for members insured by the same group plan. For some claims made the basis of this dispute, Blue Card entities represented that the patient's plan would indeed pay "UCR" or "reasonable and customary" rates. Absent an agreed payment rate under a contract, usual and customary rates often serve as the basis for paying out of network benefits.  The Centers  for Medicare Services (CMS) has defined UCR as: "the amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same  or similar services",[3] in other words the providers' charges for the services. As will be further demonstrated to the Court, the  reimbursement to Windmill by the Blue Card plans to date  have fallen well short of UCR, or any other commercially reasonable criteria. Often, Preferred Provider Plans (PPOs) are more costly as the plans provide those members may access out of network providers. How out of network providers are reimbursed under benefit plans is important as the members are responsible for the difference between the usual and customary charges and what the plan actual pays for out of network services. Inappropriate underpayment to providers leads to plan beneficiaries being responsible for the balance of the UCR charges and the patient and provider then bear the burden of that difference, unless properly paid by the plan or insurer.

32.     For other claims, Blue Card plans represented that the plan would pay the Medicare allowable or a percentage of the Medicare allowable. These Blue Card plans, or entities  apparently  allege  that  they  are  applying  some  sort  of  Medicare-based reimbursement methodology or an "allowable amount" for the services provided to its

members in determining the payment rates under the plan documents. This is however illusory, as there are no established Medicare rates for the level of care and types of services that are provided by Windmill. Medicare does not provide a rate for an inpatient residential treatment center, or the level of care provided by Windmill; however, service codes for very similar services do exist that are used by Medicare. When service codes for Windmill's services are itemized and reimbursement for each code is calculated, the reimbursement by Medicare for those services and codes exceeds the amount paid to date by the Blue Card plans. In most instances, the Blue Card plans' favored term is "allowable amount", or some variation of that term. An educated person can read a Blue Card plan all day long and never be able to discern what the "allowable amount" for any service or supply typically rendered to a patient in a physician's office, clinic or hospital. No Blue Card plan to date has been willing to disclose the basis for how it arrives at the reimbursement calculations used for the Patients' claims that received services at Windmill.

33.    Likewise, Fair Health rates for the same and/or similar services exceed the amounts paid by the Blue Card plans to date by a substantive degree. Fair Health is an independent, not for profit organization that provides information about healthcare costs with health insurers providing over a billion healthcare bills, which are added to FAIR Health's database of more than 34 billion claims. Fair health compiles that data and information from those claims to estimate what providers charge, and what insurers pay, for providing healthcare to patients across the country, including specific geographic regions. That information is made available to consumers, researchers, businesses, etc.

Many states' agencies, including Texas, utilize Fair Health data for consumer protection. Recently, the Texas Department of Insurance announced it would be utilizing Fair Health Data for determining appropriate reimbursement for out of network surprise billing disputes. Windmill's charges for the detoxification level of care are $4800 per day. For the claims made the basis this suit, BCBS paid anywhere from nothing to an approximate average of $385 per day. Yet, for some detox claims paid by BCBS to Windmill during the relevant time span, BCBS averaged payment of $1,162.35 for the detox level of care. Fair Health data shows usual and customary payment by plans at the *80% percentile of usual and customary* for the region for detox to be $3,913.00. Windmill's charges for residential care are $4200 per day. For residential treatment, BCBS has typically paid Windmill anywhere from nothing to an average of $306.00. Yet, for all claims paid by BCBS for the same time frame, BCBS paid an average reimbursement of $836.32 per day for residential level of care. Fair Health data shows usual and customary allowable at the 80th percentile to be $3,425.00 for the same services. For partial hospitalization, Windmill charges $2,275.00 per day. BCBS typically paid around $197.00 on average for this level of care. For all BCBS claims for the same time span, BCBS averaged payment of $551.54 for partial hospitalization. Yet, Fair Health data shows the 80th percentile of usual and customary payment to be $1,898.00 for these services. The same is true of intensive outpatient treatment. Windmill charges $1600 per day and BCBS has typically paid an approximate average of $115.20 for this level of care for the claims made the basis of this lawsuit. However, and on average for all claims paid by BCBS, the average reimbursement for the exact same services was $365.30.Again, Fair Health data reflects that usual and

customary reimbursement at the 80% percentile to be $1,335 for this level of care.  The

disparity in reimbursement for the same levels of care and the exact same services cannot

be justified.  BCBS's own inconsistent payments for the exact same services demonstrate

the claims were underpaid by any standard, particularly usual and customary rates.

Windmill and Patients would show that the Blue Card plans' "allowable" reimbursement

rates and levels of reimbursement lack objectively verifiable criteria to make them

commercially reasonable, and are inconsistent, even for services provided to the same

patient or patients insured by the same employer's plan.

## V.

### Windmill  Secured Assignments
### <u>and Power of Substitution from its Patients</u>

34.    For each of the patients whose admissions are made the basis of this lawsuit,

each patient/Blue Card member that was admitted to Windmill executed a set of documents

that included: (1)  an assignment of benefits and; (2) a document appointing Windmill as

the patient's authorized personal representative to take all actions necessary to pursue

administrative appeals and/or legal actions on behalf of the patient. The Assignments and

Authorizations to Appeal expressly state that Windmill is authorized to pursue legal

remedies on behalf of the member/patient. The documents provide, *inter alia,* as follows:

> *"I hereby voluntarily designate, authorize, and convey*
> *Windmill Wellness Ranch and its representatives, to the full*
> *extent permissible by law, to be my personal authorized*
> *representative regarding all rights and claims related to any*
> *services provided at this facility, which authorizes Windmill*
> *Wellness Ranch to:(1) submit any and all appeals when any*
> *entity denied me a benefit to which I am entitled;**(2) act on my***
> ***behalf in connection with any claim, right, or cause of action***

> *that may arise under my plan; (3) act on my behalf to pursue*
> *such claim, right, or cause of action in connection with said*
> *plan including, but not limited to, the right and ability to act*
> *as my authorized representative, with respect to a benefit plan*
> *governed by the provisions of ERISA as provided in 29 C.F.R.*
> *2560.503-1(b);" (emphasis added)*

35.    Every patient/member whose claim(s) are part of this dispute executed such assignments and authorizations for Windmill to act on their behalf, and each entity verified that that member had available out of network benefits for the care to be provided. Windmill therefore has the right and appropriate standing to pursue plan benefits not only as the assignee of the plan participant under ERISA, but also as the appointed personal and legal representative of the Blue Card member.  Thus, Windmill is authorized and legally appointed as the authorized personal representative to bring the claims in this lawsuit in the name of Patients, as identified by their Blue Card Subscriber Number within Exhibits 1 – 18 to this complaint, and as an assignee of Patients.  The Patients that are plaintiffs in this lawsuit seek to recover payment of benefits that are due them and to their medical care provider, Windmill. The Case Defendants have denied benefits to Patients in connection with ERISA-governed plans, as well as some non-ERISA plans, as further pleaded below. Copies of Patients' appointments of Windmill as their authorized personal representative and their assignments to Windmill of the right to receive payment for its services are attached hereto as Exhibits 19-A-1, 19-A-2, 19-B-1, 19-B-2, 19-C-1 and 19-C-2.[2]

**VI.**

---

[2] The Authorizations and Assignments of Patients are broken into six exhibits due to current file size limitations for PACER ECF.

## **Submission of the Claims and Underpayments**

36.     For each of the claims made the basis of this dispute, the Blue Card plan represented that the patient had coverage under the plan, and the proposed services were authorized. In some cases, "usual and customary" was stated by the Blue Card plan as the basis for reimbursement. In other cases, Medicare rates, or a multiplier based on Medicare rates was stated to the applicable. Several different payment standards were stated as applicable by these various Blue Card plans. Windmill relied on these various representations in admitting Blue Card plan members to its facility and providing its services. As communicated to Windmill, this created an expectation of reasonable reimbursement; however, as detailed further below, these payment standards were meaningless because the adjudication of the claims in question did not actually rely on any such standards. According to the Blue Cross and Blue Shield of Texas  Explanations of Benefits, (issued on behalf of these various out-of-state Blue Card plans), "usual and customary", "allowable amount" under the plan and/or Medicare rates were never the basis for the reimbursement tendered. The truth on this question has yet to be discovered and/or explained.

37.     As customary in the industry, after services were provided to Patients, Windmill submitted its claims for each payment. However, the claims in dispute have either not been paid at all, or they were grossly underpaid with a vague explanation as to the manner in which the reimbursement amount was determined. In every instance relevant to this lawsuit, the Explanation of Benefits (EOBs) received by Windmill for services

rendered to Patients Was generated by and received from Blue Cross Blue Shield of Texas. Every Blue Card plan used Blue Cross Blue Shield of Texas to process their claim and submit payment, if any, to Windmill. These Explanations of Benefits ("EOBs") contained vague terms, such as:

> "Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement. Note: This adjustment amount cannot equal the total service or claim charge amount; and must not duplicate provider adjustment amounts (payments and contract reductions) that have resulted from the prior payer (s) adjudication".

38.    Some EOBs reference or infer that the claims are being processed in accordance with a contract with Windmill and that the patient cannot be billed, even though Windmill is not contracted with any Blue Cross Blue Shield entities. Other EOBs make cryptic reference to Medicare part A and part B even though the plan is not a Medicare plan and Windmill did not submit a claim for a Medicare beneficiary.[6]  Other reasons and denial codes include: (a) services are not covered by contract for this type of provider; (b) maximum benefit available for this service has been paid;(Although at patient admission. the applicable plan represented that benefits were available, and the services were covered); (c) service not eligible - failed to meet group guidelines (although the plan represented that the services were indeed covered and eligible); (d) maximum benefit available for this service has been paid (although the plan never  represented at admission that benefits were in any way limited); (e) charge exceeds Medicare's allowed amount (there is no Medicare allowable for the level of care), and; (f) type of procedure done is not covered by this contract (although the plan represented that services were covered and available and the parties have no direct contract). The EOBs provide no specificity or

clarity as to the way the claims were adjudicated, paid, underpaid or the basis of that reimbursement, if any at all. In fact, BCBS has paid some claims at higher rates, while drastically underpaying other claims for the same services to a Blue Card plan member under the same health plan.

## VII.
## Requests from Patient and Windmill for Plan Documents Ignored

39.     The actual methodologies underlying the BCBS Defendants' reimbursement practices and methodologies are not readily ascertainable to Patients or Windmill ─ and are not even likely known to the Blue Card plans' own customers. They are certainly not disclosed in the plan benefit descriptions that the Blue Card plans disseminate to the public. The reimbursement methodologies of the Blue Card plans have never been disclosed to Patients or Windmill. Perhaps, the Blue Card plans consider its internal procedures to be proprietary, trade secrets.  However, as an entity with authority over ERISA plan assets, it is required to produce health plan documents and policies it issues to employers, as well as to the beneficiaries of those plans. This is required the ERISA regulations promulgated by the U.S. Department of Labor found in Title 29 of the CFR. Such plan descriptions are required to contain the following:

a.      Cost-sharing provisions, including premium, deductible, co-insurance and co-payment amounts for which the participant or beneficiary will be responsible.

b.      The extent to which preventive services are covered under the plan.

c.      Whether, and under what circumstances, existing and new drugs are covered under the plan.

d.      Whether, and under what circumstances, coverage is provided for

medical tests, devices and procedures.

e.    Provisions governing the use of network providers; the composition
      of provider networks; and whether, and under whatcircumstances,
      coverage is provided for out-of-network services.

f.    Provisions requiring pre-authorizations or utilization review as a
      condition to obtaining a benefit or service under the plan.

29 CFR § 2520.102-3 (Emphasis added).

40.    Windmill and Patients have repeatedly requested plan documents to
determine plan benefits for itself, as well as its patients, who are often interested in the
actual language of their plan and its terms for coverage of behavioral health. Windmill has
additionally had many of the Patients  for copies of their own plan documents during their
treatment, so they can fully understand the benefits available under the plan, what the plan
will provide and what the patients' responsibility will be. Substantially  all such efforts by
Windmill and Patient have proven futile and the requests are ignored.

41.    Windmill has sent requests via certified mail with written authorization of
the insured beneficiary , requesting the complete plan document for both medical/surgical
and mental health substance use disorder benefits. Windmill has often additionally
requested that BCBS provide specific plan provisions that support any excluded coverage
of services for co-occurring substance use disorder treatment including the levels of care
criteria and clinical guidelines and methodologies used to establish reimbursement rates.

42.    Windmill has also requested clinical standards, guidelines, methodologies
and source materials used for determining reimbursement rates to ascertain whether the
requirements of the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction

Equity Act of 2008 (MHPAEA) are being followed. The Mental Health Parity and Addiction Equity Act of 2008 ("Federal Parity Act") and the equivalent Texas statutes found at the Texas Insurance Code, Section 1355.004 and 1368.002 ("Parity Acts") provide that mental health and substance use disorders must be provided at the same level of benefits provided for physical illnesses. Fully funded plans or fully insured plans (plans for which BCBS pays for benefits from its own assets and premiums received) are required to provide parity. Likewise, self- funded plans for which BCBS administers the underlying ERISA plan reimburse medical care providers from assets of the group plan that provides coverage for substance use disorders and mental health. In this regard, plans and insurance carriers are prohibited by state and federal law from denying coverage for medically necessary services or to otherwise apply quantitative or non-quantitative restrictions or limitations on coverage of medically necessary medical services relating to substance abuse and mental health services.

43.     The Blue Card plans named as defendants herein, as the insurer and/or third-party administrator of the applicable plan(s), appear unwilling to make such disclosures, even  when authorized in writing by their insured  members. Without such disclosures, it is virtually impossible to  ascertain  tangible details of any plan to which Patients subscribed.

44.     Windmill initially brought this action to determine and secure appropriate reimbursement for the medical care it provided to approximately 159 admissions of 151 patients from 2017 through 2019 that were ostensibly policyholders or dependents of  policyholders under insurance policies issued by Defendants. Alternatively,  these patients were participants or beneficiaries of health plans issued or administered by

Defendants. After dismissing the aforementioned Blue Cross Blue Shield of Texas/HCSC claims, the remaining claims at issue in this action involve amounts in dispute for each Blue Card plan, details of which follow below.

45. For the services provided to Alabama Blue Card members as identified on Exhibit 1 as attached hereto, Windmill's usual and customary charges for services provided to 4 members totaled $220,325.00. To date, the plan has tendered reimbursement of $7,437.00, or 3 percent (3%) of Windmill's usual and customary charges.

46. For the services provided to Arkansas Blue Card members as identified on Exhibit 2 as attached hereto, Windmill's usual and customary charges for services provided to 2 members totaled $237,025.00. The plan has only tendered reimbursement of $2,114.83, less than 1 percent (1%) of Windmill's usual and customary charges.

47. For the services provided to California Blue Card members as identified on Exhibit 3 as attached hereto, Windmill's usual and customary charges for services provided to 39 members totaled $1,845,300.00. The California plan has tendered reimbursement of $246,306.7, or 13 percent (13%) of Windmill's usual and customary charges.

48. For the services provided to a single Delaware Blue Card member as identified on Exhibit 4, as attached hereto, Windmill's usual and customary charges for services provided to that member totaled $87,300.00. The plan has tendered reimbursement of $7,341.60, or a bit less than 9 percent (9%) of Windmill's usual and customary charges.

49. For the services provided to Florida Blue Card members as identified on Exhibit 5 as attached hereto, Windmill's usual and customary charges for services provided

to those 2 members totaled $186,625.00.    The plan has tendered reimbursement of $4,746.00,  or a bit less than 3 percent (3%) of Windmill's usual and customary charges.

50.    For the services provided to Idaho Blue Card members as identified on Exhibit 6 as attached hereto, Windmill's usual and customary charges for services provided to 1 member totaled $173,825.00.  The plan has tendered reimbursement of $3,479.00, or 2 percent (2%) of Plaintiff's usual and customary charges.

51.    For the services provided to Kansas Blue Card members as identified on Exhibit 7 as attached hereto, Windmill's usual and customary charges for services provided to that member totaled $35,300.00.  The plan has tendered reimbursement of $1,790.87, or 5 percent (5%) of Windmill's usual and customary charges.

52.    For the services provided to Maryland Blue Card members as identified on Exhibit 8 as attached hereto, Windmill's usual and customary charges for services provided to 2 members totaled $92,400.00.  The plan has tendered reimbursement of $1,714.00, less than 2 percent of Windmill's usual and customary charges.

53.    For the services provided to Massachusetts Blue Card members as identified on Exhibit 9 as attached hereto, Windmill's usual and customary charges for services provided to 1 member totaled $60,400.00.   The plan has tendered reimbursement of $5,582.93, or 9 percent (9%) of Windmill's usual and customary charges.

54.    For the services provided to Missouri Blue Card members as identified on Exhibit 10 as attached hereto, Windmill's usual and customary charges for services provided to 1 member totaled $52,150.00.  The plan has tendered reimbursement of $3,675.19, or 7 percent (7%) of Windmill's usual and customary charges.

55.    For the services provided to New York Blue Card members as identified on Exhibit 12 as attached hereto, Windmill's usual and customary charges for services provided to 2 members totaled $295,475.00.  The plan has tendered reimbursement of $22,992.75, less than 8 percent (8%) of Windmill's usual and customary charges.

56.    For the services provided to North Carolina Blue Card members as identified on Exhibit 13 as attached hereto, Windmill's usual and customary charges for services provided to 1 member totaled $109,800.00.  The plan has tendered reimbursement of $8,304.68, less than 8 percent (8 %) of Windmill's usual and customary charges.

57.    For the services provided to Ohio Blue Card members as identified on Exhibit 14 as attached hereto, Windmill's usual and customary charges for services provided to 15 members totaled $2,539,275.00.  The plan has tendered reimbursement of $370,801.50, less than 13 percent (13%) of Windmill's usual and customary charges.

58.    For the services provided to Pennsylvania Blue Card members as identified on Exhibit 15 as attached hereto, Windmill's usual and customary charges for services provided to 2 members totaled $318,350.00.  The plan has tendered reimbursement of $56,758.68, less than 18 percent (18%) of Plaintiff's usual and customary charges.

59.    For the services provided to South Carolina Blue Card members as identified on Exhibit 16 as attached hereto, Windmill's usual and customary charges for services provided to 2 members totaled $126,950.00.  The plan has tendered reimbursement of $6,647.07, or five percent (5%) of Windmill's usual and customary charges.

60.    For the services provided to Virginia Blue Card members as identified on Exhibit 17 as attached hereto, Windmill's usual and customary charges for services

provided to 2 members totaled $56,400.00.   The plan has tendered reimbursement of $7,308.25, or thirteen percent (13%) of Windmill's usual and customary charges.

61.   For the services provided to Washington Premera Blue Card members as identified on Exhibit 18 as attached hereto, Windmill's usual and customary charges for services provided to 1 member totaled $4,800.00.  The plan has tendered reimbursement of $286.22, less than 6 percent of Windmill's usual and customary charges.

## VIII.
## ERISA-GOVERNED PLANS:

## APPLICATION OF THE MENTAL HEALTH PARITY AND
## ADDICTION EQUITYACT OF 2008 AND TEXAS LAW REQUIREMENTS

62.   Patients and Windmill are informed and believe that most, if not all of the Blue Card plans s are plans regulated by the Employee Retirement Income Security Act of 1974 ("ERISA") and many would thereby also be required to comply with the The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) , *i.e.*, the "Parity Act" and/or the equivalent Texas statutes found at the Texas Insurance Code, Section 1355.001 *et. seq*. and 1368.001 *et. seq.* ("Texas Parity Act").   In general, the Parity Act requires that mental health and substance abused disorder ("MH/SUD") benefits are administered in a way no more restrictive than benefits for medical and surgical treatment. The analysis comparing how benefits are administered is separated into "quantitative" treatment limitations (QTLs) and "nonquantitative" treatment limitations (NQTLs). Examples of QTLs include: (1) financial restrictions, such as separate deductibles or different copays for MH/SUD treatment; and (2) quantifiable treatment limitations, such as annual or aggregate visit limits. The Parity Act requires that health plans

eliminate quantitative treatment limitations ("QTLs") if the plan does not impose similar limits on medical and surgical benefits. Plans must also ensure parity among non-quantitative treatment limitations ("NQTLs"), which include managed care practices such as medical necessity determination, formulary design for prescription drugs, provider network adequacy, and utilization review procedures. In the case of NQTLs, the plan must ensure that the NQTLs applicable to MH/SUD benefits "are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."

63.    The Parity Act has undergone several changes since it passed in 2008. First, the Affordable Care Act (ACA) expanded parity coverage and required all plans offered in the individual health insurance market and the ACA's health insurance exchanges to comply with federal parity requirements. The 21st Century Cures Act then amended the Parity Act to require the Tri-Agencies to convene a public meeting of stakeholders, to develop compliance program documents, and to issue guidance on disclosure requirements so consumers can access information about their MH/SUD benefits. The Parity Act was also amended in December 2020, through the Consolidated Appropriations Act of 2021, which required health plans to make information available to regulators regarding any NQTLs used in their plan design. The Act requires any group health plan that "provides both medical and surgical benefits and mental health or substance use disorder benefits… shall ensure that:

(i)     the financial requirements applicable to such mental health or substance use disorder benefits are not more restrictive than the predominant financial

requirements applied to substantially all medical and surgical benefits covered by the plan (or coverage), and there are no separate cost sharing requirements that are applicable only with respect to mental health or substance use disorder benefits; and

(ii)     the treatment limitations applicable to such mental health or substance use disorder benefits are not more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plans or coverage), and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."

64.     In defining the Parity Act requirements, the relevant federal agencies have explained that it is impermissible to impose more restrictive quantitative limitations on mental health coverage than for medical or surgical services. It is also impermissible for those administering plans to "impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification." 29 C.F.R. § 2590.172(c)(4)(i). The final administrative rules governing the Parity Act describe and proscribe certain conduct by health plans. "Nonquantitative treatment limitations" ("NQTLs"), "which are limits on the scope or duration of treatment that are not expressed numerically," and provide an "illustrative list" of NQTLs which are subject to the Federal Parity Act requirements. This non-exhaustive list includes "methods for determining usual, customary and reasonable

charges", which would include the methods by which BCBS determines usual and customary rates or determining allowed amounts or eligible expenses for out of network services. *See* 78 Fed. Reg. 68239-96 ("Final Parity Act Rule"). Thus, if an insurer provides both medical and surgical benefits and mental health or substance use disorder benefits, the insurer must ensure that both the financial requirements and the treatment limitations applicable to the mental health and substance use disorder benefits are no more restrictive than the predominant financial requirements and treatment limitations that apply to medical and surgical benefits. The Parity Act denies the terms "financial requirement to include deductibles, copayments, coinsurance and out of pocket expenses. 29 U.S.C. §1185a(3)(B)(i). Treatment limitation is defined to include "limits on the frequency of treatment, number visits, days of coverage, or other similar limits on the scope or duration of treatment. *Id*. §1185(a)(3)(B)(iii). The regulations further provide there are two types of treatment limitations that may run afoul of the statute's prohibition: 1) Quantitative (QTL)- that are expressed numerically, such as 50 visits per year; and 2) Nonquantitative (NQTL) – which otherwise limit the scope or duration of benefits for treatment under a plan.

65.     Windmill would further show that the American Society of Addiction Medicine ("ASAM") has developed nationally and clinically recognized criteria for addiction treatment guidelines and coverage. ASAM establishes and publishes these treatment and coverage guidelines, which are uniformly accepted by clinicians and providers for addiction, substance related disorders, mental health and co-occurring conditions for all levels of care.   The Texas Insurance Code and the Texas Administrative

Code also set forth treatment guidelines relating to chemical dependency treatment centers that closely follow ASAM clinical guidelines. See §3.8001 *et. seq.* As an example, the Texas Administrative Code provides that the recommended length of stay for inpatient detoxification services is up to 14 days (§3.8010), the recommended length of stay for inpatient rehab/treatment is 14 to 35 days (§3.8014) and the recommended length of stay for partial hospitalization services is between 4-35 days. Section 1355.004 provides that plans must provide coverage, based on medical necessity, for not less than 45 days of inpatient treatment for the treatment of serious mental illness in each calendar year.

66.     Although the Blue Card plans  may assert that their guidelines and clinical policies are consistent with accepted standards of care when adjudicating claims, this is not true. Windmill and Patients suspect that the Blue Card plans know a great deal about federal and state parity laws; however, they attempt to avoid them through obfuscation and secrecy through non-disclosure. By keeping Patients and medical care providers occupied with futile administrative claim processes rather than the medical and clinical requirements mandated by statute and regulation, the threat of legal action by Patients is diminished and becomes less of a business concern. The Blue Card plans seemingly adopt and employ clinical and financial criteria on the fly. For that matter, the extent of coverage for the mental health and substance abuse care, as well as Patients' ultimate financial responsibility remain unresolved as to the claims remaining at issue in this lawsuit.

67.     Data relating to  utilization criteria of Blue Card plans for Patients that are plaintiffs in this lawsuit  previously admitted to Windmill demonstrably indicate the coverage and clinical determinations of Blue Card plans do not fulfill the standard of care

necessary to properly treat Patients. On information and belief, the Blue Card plans authorize fewer level of care requests for detoxification, partial hospitalization, residential care or intensive outpatient care. When care is authorized by a Blue Card plan, fewer days are typically approved than are provided for under established clinical guidelines. As an example, BCBS entities on average only approve 2.7 days for detoxification, which is well below established standards. In many cases, detoxification cannot be accomplished in such a short timeframe. Windmill consistently receives treatment and authorization denials, including some for claims made the basis of this suit, that simply do not meet ASAM and industry standards when additional and a higher level of care is clinically indicated. Blue Card plans often reference unsubstantiated clinical guidelines that are not otherwise required under ASAM in denying care. For example, Blue Card entities will deny care for inpatient detoxification, stating the patient is not at risk for life threatening withdrawals, or does not have acute mental health issues, none of which meets ASAM clinical standards. For partial hospitalization, these Blue Card plans may deny necessary medical care, stating the patient is not suicidal or homicidal, patient has no medical issues that need treatment in this level of care, patient has no thoughts to hurt others, or patient is not aggressive none of which are required criteria under established clinical standards.

68.    The Blue Card plans' low levels of reimbursement to Windmill for out-of-network services results in a much higher out of pocket expense to Patients for behavioral health and substance abuse treatment. Patients contend this is in violation of the Act. Patients contend that this results in a more restrictive financial requirement than the plans impose for corresponding medical/surgical benefits — just the opposite of parity. As

described above, Blue Card plans often state that they will pay usual and customary rates, some unknown and unverifiable rate based on Medicare rates, or the "allowable rate" under the plan. Blue Card plans then remit extremely low reimbursement rates with no tangible explanation for the basis of that payment rate. Payment for these out of network behavioral health care do not meet usual and customary rates and/or fails to meet the benefits provided for under the plan. As for Medicare based reimbursement as example, there are no comparable Medicare rates for the level of care and types of services being provided by Windmill.   This effectually leaves the financial liability and obligation with the member and the provider, rather than the plans that are intended to provide coverage for mental health and substance abuse treatment. The Blue Card plans' adjudication of Patients' claims constitutes a violation of the Federal Parity Act as an impermissible, nonquantitative methodology that is financially restrictive. Likewise, denial of extended coverage and care and benefits for necessary treatment is an impermissible quantitative restriction.

69.     Windmill is further informed and believes that, with respect to self-funded ERISA plans which have not specifically designated a plan administrator, the Blue Card plans function as *de facto* plan administrators, or as the co-administrators because, *inter alia*, they issue policies and/or plan documents to participants and beneficiaries of their plan products, receive benefit claims, evaluate and process those claims, make benefit determinations, make and administer benefit payments. They also receive and adjudicate administrative appeals of pre-service and post-service adverse benefit determinations. Moreover, Windmill and Patients are informed and believe that, even with respect to self-funded  ERISA  plans, which have not specifically designated a plan administrator,

Defendants have been designated as the claim administrator and have been delegated the responsibilities described above. Specifically, with respect to Patients' ERISA claims at issue herein, including with respect to self-funded employers, which have not yet been named as defendants in this action, Windmill and Patients are informed and believe that Defendants:

a) drafted and provided plan members with plan documents;

b) operated a centralized verification and authorization telephone number which handled calls for members of the self-funded plans, including plans that have not yet been joined as defendants in this action;

c) authorized Windmill to provide medical services to beneficiaries of numerous ERISA plans;

d) received and processed electronic bills from Windmill for claims for members of the self-funded plans, including plans that are not yet joined as defendants in this action;

e) communicated with Windmill on behalf of the ERISA plans (and additional self-insured plans that are not named as defendants) regarding authorization of specific behavioral health and substance abuse treatment protocols;

f) issued remittance advices and EOBs;

g) repriced claims for themselves when the plan was insured;

h) repriced claims for self-insured ERISA plans;

i) communicated with Patients and Windmill with respect to the processing of claims on behalf of the self-insured plans;

j) processed and adjudicated appeals, and sent appeal response letters; and;

k) issued reimbursements and Explanations of Benefits.

**IX.**

## ALLEGATIONS COMMON TO ALL CLAIMS
## OF WINDMILL AND PATIENTS

70.    It is standard in the health care industry that when medical care facilities, such as Windmill, enter into written contracts with a health insurer that also operates as a managed care organization and plan administrator for both private sector and governmental entities, such as Defendants, the medical facility agrees to accept reimbursement that is discounted from the its billed charges in exchange for the benefits of being a "contracted provider" (*i.e.*, a provider with a written contract with the plan). These benefits include an increased volume of business because the health plan provides financial and other incentives for its members to receive their medical care at the contracted provider, such as advertising that the provider is  "in-network," and allowing the members to pay lower co-payments and deductibles to use the contracted provider.

71.    Conversely, when medical facilities such as Windmill, do not have a written contract with a health insurance company/managed care organization, the facility receives less business from the insurance company administering health plans, as the health plan discourages its members from receiving their medical care from out-of-network providers. Because, in such circumstances, the health plan is discouraging its members  from receiving their care at the non-contracted facility, the non-contracted facility has no obligation to reduce its charges and is entitled to receive payment based on their usual and customary charges for the services rendered. Although out of network benefits are almost always less generous to the plan member than in-network benefits, the health plan is not entitled to a discount from a medical care provider's billed charge, as the provider is

receiving none of the benefits of that are associated with being an in-network provider, *i.e.*, steerage of business to the provider.  This is particularly true as to Windmill as it is licensed as a co-occurring specialized treatment facility that provides a level of care and range of services that are not available elsewhere in  its geographic region.

72.     In non-contracted situations, the named Blue Card plans have inappropriately underpaid Windmill for medically necessary services it has provided to Blue Card plan members, insureds and/or beneficiaries of the employer-sponsored plans, which are these defendants' clients. The Blue Card plans use baseless or flawed methodologies and systems to unilaterally determine what arbitrary and unsubstantiated amounts mental health and substance abuse treatment facilities like Windmill should be reimbursed for their services.

73.     Windmill and Patients are informed and believe that the Blue Card plans' systems for paying out-of-network claims are intentionally flawed and skewed in such a manner that improperly manipulates the data in its claim adjudication systems to calculate inappropriately low amounts of reimbursement for the claims of insureds and plan beneficiaries that choose to receive services from Windmill and/or similar facilities. Industry data  supports this contention  when comparing the reimbursement rates employed by the Blue Card plans to Fair Health data for mental health and substance abuse  services provided by Windmill to Patients.

74.     For Patients' claims at issue, Windmill provided behavioral health and substance abuse treatment services to the insureds and beneficiaries  of the Blue Card plans that include both private sector plan sponsors and public sector employers.

75.    For Patients' claims at issue, once an individual patient's insurance was identified, Windmill confirmed that the patient was an eligible member of the plan or one of the Blue Card plans administered by one of the named defendants by contacting the respective Blue Card plan via telephone, facsimile or the Internet.

76.    Before a patient is admitted, Windmill contacts the Blue Card plan (or any other similar managed care organization) every time a patient seeks services or admission to its facility so that Windmill is informed and has some reasonable certainty that the pertinent health plan insures the patient or administers a plan of health care coverage applicable to the given patient. The plan member I.D. cards issued to patients generally lack specific information as to the name or address of the plan sponsor, leaving it unclear to Windmill as to the specifics of the policy or plan of a given patient.

77.    At all times relevant to this action, Windmill's charges were usual, customary and reasonable for the service rendered at the time and place they were rendered, for an out-of-network behavioral health and substance abuse treatment facility.

## X.
## ERISA CLAIMS

78.    Individuals and enrolled dependents who receive their health insurance through a private sector, employer-based benefit plan are generally defined as participants or beneficiaries of plans governed by the federal Employee Retirement Income Security Act of 1974 ("ERISA"), as amended. 29 U.S.C. § 1001 *et seq*.  These "ERISA plans" are sometimes fully insured by health insurers, while in other cases the plan is self-funded, and a third, frequently used plan deign is to self-fund to a specific "attachment point", which is

the dollar threshold at which excess loss insurance will indemnify the plan when medical claims exceed the specific attachment point, either for the entire membership of the plan within a plan year, or for a specific beneficiary whose claims exceed a stated threshold within a plan year. In all cases, the plan sponsor and any insurer remain financially responsible for claims arising from that plan.

79.    Windmill and Patients are informed and believe that the Blue Card plans are the ERISA plan administrators and ERISA fiduciaries for the ERISA claims at issue in this Complaint, or are otherwise a proper ERISA defendant, because they assert direct control over the decision whether to prospectively approve mental health or substance abuse treatment to Patients, whether pay or deny a claim and the amount of reimbursement made to a medical provider. Therefore, the Blue Card plans also determined the amount that Patients would be required to pay for their portion of their medical care expenses.

80.    Upon information and belief, with respect to the self-insured ERISA plans at issue herein, sponsoring employers enter into agreements with the Blue Card plans to perform administrative and other key responsibilities such as (a) certifying or authorizing Windmill's provision of services to Patients; (b) receiving Windmill's claims; (c) repricing the claims; (d) processing and administering the claims and appeals; (e) approving or denying the claims; (f) deciding whether or not to transfer the members to other in-network facilities; (g) directing whether and how to pay the claims; (h) issuing remittance advices and explanations of benefits; (i) communicating with Windmill regarding the claims and services; (j) communicating with members regarding the claims and services;

and (k) in almost all instances, issuing payment. On information and belief, these agreements are structured such that the Blue Card plans have a financial incentive to keep benefit costs to the funding entity low, particularly in the case where the Blue Card plan is also the liable insurer.

81.    On information and belief, the Blue Card plans each function as an ERISA plan administrator with respect to those claims upon which it has exercised delegated authority to provide plan documents to participants and beneficiaries, receive benefit claims, evaluate and process those claims, review the terms of the plan, make initial benefit determinations, make and administer benefit payments, handle appeals of benefit determinations, and serve as the primary point of contact for members and providers to communicate regarding benefits and benefit determinations. In carrying out these ERISA plan administrator functions, the Blue Card plans possess authority and fiduciary discretion to manage and administer the ERISA plans. At all times relevant to this action, the Blue Card plans were acting as the agent of each of their insured plans and/or its other clients which secured health insurance or other administrative services relating to employer-sponsored health plans established under ERISA. As such, the defendant Blue Card plans were acting as agent for its principal with actual or apparent authority to transact business with third parties, including Windmill, on behalf of all such principals, in turn making those principals either contractually or vicariously liable for the acts and/or omissions of certain employers that are also plan sponsors.

82.    ERISA plans, whether fully insured or self-funded, typically contain provisions for paying non-contracted hospitals at the usual, customary and reasonable rate.

("UCR") The language and acronyms vary somewhat from plan to plan, and may be described as the "Usual, Customary and Reasonable" rate, the "Reasonable and Customary" amount, the "Usual and Customary" amount, the "Reasonable Charge," the "Prevailing Rate," the "Usual Fee," the "Competitive Fee," or someother similar phrase. In the context of the healthcare industry, these phrases are all synonymous with usual and customary rate. Upon information and belief, no provisions in Defendants' benefit plans, whether in their Summary Plan Descriptions or Evidence of Coverage, justified the failure to pay the usual and customary rate, or its equivalent, to Windmill for services provided to the Blue Card plans' insureds as well as participants and beneficiaries of self-funded plans.

83.    The formal mechanism for a health plan or plan administrator to explain why a claim is denied (meaning that the allowed amount is anything less than full billed charges) is an explanation of benefits ("EOB"). Defendants were required to issue EOBs in conformance with 29 U.S.C. § 1133 as implemented by 29 C.F.R. 2560.503-1. Specifically, under 29 C.F.R. § 2560.503-1(g), they were required to:

> provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv).The notification shall set forth, in a manner calculated tobe understood by the claimant –
>
> > (i)    The specific reason or reasons for the adverse determination;
> >
> > (ii)    Reference to the specific plan provisions on whichthe determination is based;
> >
> > (iii)    A description of any additional material or

information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)   A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v)    In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits.

(A)   If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or,

(B)   If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

(C)   In the case of an adverse benefit determination by a group health plan concerning a claim involving urgent care, a description of the expedited review process applicable to such claims.

84.    The Blue Card plans have never previously contended that they denied or reduced reimbursement to Windmill on the basis that Windmill had not obtained a proper

assignment of benefits, or that Windmill was not otherwise a valid assignee of the plan beneficiary. Likewise, the Blue Card plans have never previously contended that Patients had not appointed Windmill as their authorized representative to pursue claims for healthcare benefits on behalf of Patients whose claims are at issue in this action.

85.     Where an implied-in-law agreement exists, and no specific payment terms have been agreed upon or are in dispute, payment for the services is based upon the reasonable and customary fair market value.

86.     Windmill's charges are usual, customary and reasonable under the legal standards applicable in Texas to defining "reasonable and customary" or "fair market value".

87.     After Windmill provided medical care to Patients, who are also insureds and/or beneficiaries of the Blue Card plans, Windmill submitted Patients' claims to be processed.

88.     On information and belief, Patients allege that the Blue Card plans failed to reimburse Windmill properly and according to the express provisions of the health plans applicable to the respective members and/or insureds of the various Blue Card plans. Patients allege that Windmill is entitled to recovery of the difference between the payment it received and the amount due per the express terms of the affected ERISA plans and the plans of employers not subject to ERISA, if any. If Windmill is reimbursed a lesser sum, this in turn increases the financial liability to Patients.

89.     As the authorized representative of Patients, Windmill has appealed each claim and exhausted all administrative remedies as a condition precedent to bringing the

claims in this lawsuit.  The Blue Card plans' business practices have prevented Patients from pursuing any meaningful appeal process necessary to obtain reimbursement at usual and customary and appropriate rates of reimbursement.  If full exhaustion under any certain plan provision(s) may not have been fully completed, such completion or "exhaustion" is excused because the appeal process was not followed by the Blue Card plans and would therefore have been futile. An objective review of the history of the administrative appeals submitted to Blue Card plans for Patients, whose claims are at issue in this lawsuit, will reflect that no Blue Card plan has ever agreed to modify its original coverage decision on any of the claims of Patients for healthcare services rendered to them by Windmill.  Because Patients and Windmill participated in these processes to the degree possible without the benefit of plan documents, Patients and Windmill allege that the administrative records will also show a lack of compliance with plan administration requirements found in the regulations of the Department of Labor for ERISA-governed health plans, as well as a lack of compliance with federal and/or state Parity Laws.

## XI.
## Inaccuracies and Misrepresentations in Information Provided to Windmill

90.    As explained above, Windmill did not have contracts with the Blue Card plans, governing the reimbursement rates for Patients' services rendered by Windmill. Notwithstanding its lack of a contract with Windmill, the Blue Card plans  represented in written communications to Windmill, including in remittance advices and explanation of benefit forms ("EOBs"), that the Blue Card plans  were not required to pay the charges

submitted by Windmill based on the express terms of any given insurance policy or employer-sponsored plan. Moreover, none  of those written communiques stated with specificity any plan provisions applicable to out-of-network claims in  EOBs issued to Windmill on behalf of Patients.

91.    Most explanation of benefit forms ("EOBs") that Windmill received from Blue Card plans  in connection with Patients' claims  repeatedly contained the following boiler plate language:

> **"Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement. Note: This adjustment amount cannot equal the total service or claim charge amount; and must not duplicate provider adjustment amounts (payments and contractual reductions) that have resulted from prior payer(s) adjudication. (Use only with Group Codes PR or CO depending upon liability".**

These repeated statements made to Windmill were at best  inaccurate because Windmill was neither a contracted provider, nor providing services for which any contracted rates or legislated fee arrangements would apply. The Blue Card plans knew or should have known that Windmill was not in privity of contract with the Blue Card plans or any plan sponsor utilizing the administrative services of any Blue Card plan. Therefore, the plans knew that such representations to Patients and Windmill were not true and not subject to contracted or legislated rates. Patients and Windmill are informed and believe that  the Blue Card plans knowingly made these representations in written correspondence, including remittance advices and EOBs to mislead Patients and Windmill.

## XII.

## COUNT ONE:

## Claim for Civil Enforcement Under 29 U.S.C. § 1132(a)(1)(B)
## For Failure to Properly Pay ERISA Plan Benefits

92.    Windmill and Patients incorporate all allegations set forth in the above paragraphs one (1) through ninety-one (91) above as though fully set forth here verbatim.

93.    The claims made the basis of this Plaintiff's Fifth Amended Original Complaint are contained in Plaintiffs' Exhibit 1 through 18, attached hereto. Complete Patient identifying information not intended for public disclosure has been redacted from these Exhibits. Unredacted versions of these exhibits with patient identification information will be shared with counsel and the Court as needed.

94.    Patients and Windmill allege this claim for relief in connection with claims for treatment rendered to Patients covered by  health benefit plans governed by ERISA. This is a claim to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B).

95.    Patients  have standing to pursue these claims as plan beneficiaries and real parties in interest. Windmill has standing to assert its assignment of benefits and to assert claims in its own right not derivative of any  assignment from any patient or any other person.

96.    Patients  alleged that benefits are owed to them and to Windmill  under the various ERISA plans insured and/or administered by the Blue Card plans.  Patients have also duly authorized and appointed Windmill to act as their  legal representative to bring such claims, causes of action and to seek legal redress on their behalf.

97.     As of the date of filing this Fifth Amended Original Complaint, some of the Defendants produced plan documents, or portions of purported plan documents, for the purpose of asserting "anti-assignment" provisions in certain plans in support of their motions to dismiss.

98.     Patients and Windmill reviewed the plan documents submitted to ascertain whether any of them contained any information from which Patients or Windmill could determine the amount of benefits, or even a reasonable estimate, of what the benefits actually were for mental health or substance abuse treatment. Not one of them contains any such information. Of the Blue Card plans that submitted plan documents, the following is a summary of what is stated about the plan's coverage for mental health or substance abuse treatment:

### MASSACHUSETTS

For Other Health Care Providers. For health care providers who do not have a PPO payment agreement with Blue Cross Blue Shield HMO Blue or for health care providers outside of Massachusetts who do not have a payment agreement with the local Blue Cross and/or Blue Shield Plan, the allowed charge is based on 150% of the Medicare reimbursement rate. If there is no established Medicare reimbursement rate, the allowed charge is based on the amount determined by using current publicly-available data reflecting fees typically reimbursed for the covered service, adjusted for geographic differences. (There may be times when the Medicare reimbursement rate is not available for part of a claim for covered services. When this happens, the allowed charge will be based on the lesser of: the total of the Medicare reimbursement rate for the part for which there is a Medicare reimbursement rate plus the provider's actual charge for the part for which there is no Medicare reimbursement rate; or the amount determined by using the current publicly-available data described above for all parts of the claim for the covered services.) Blue Cross Blue Shield HMO Blue has the discretion to determine what current publicly-available data it deems applicable, by using the data maintained by a third party of its choice. In no event will the allowed charge be more than the health care provider's actual charge. However, the allowed charge may sometimes be less than the health care provider's actual charge. If this is the case, you will be responsible for the amount of the covered provider's actual charge that is in excess of the allowed charge ("balance billing").

## FLORIDA

In the case of an Out-of-Network Provider that has not entered into an agreement with Florida Blue to provide access to a discount from the billed amount of that Provider for the specific Covered Services provided to you, the allowed amount will be the lesser of that Provider's actual billed amount for the specific Covered Services or an amount established by Florida Blue that may be based on several factors, including but not limited to: (i) payment for such Covered Services under the Medicare and/or Medicaid programs; (ii) payment often accepted for such Covered Services by that Out-of-Network Provider and/or by other Providers, either in Florida or in other comparable market(s), that we determine are comparable to the Out-of-Network Provider that rendered the specific Covered Services (which may include payment accepted by such Out-of-Network Provider and/or by other Providers as participating Providers in other Provider networks of third-party payers which may include, for example, other insurance companies and/or health maintenance organizations); (iii) payment amounts which are consistent, as determined by us, with our Provider network strategies (e.g., does not result in payment that encourages Providers participating in a Florida Blue network to become non-participating); and/or, (iv) the cost of providing the specific Covered Services. In the case of an Out-of-Network Provider that has not entered into an agreement with another Blue Cross and/or Blue Shield organization to provide access to discounts from the billed amount for the specific Covered Services under the BlueCard Program, the allowed amount for the specific Covered Services provided to you may be based upon the amount provided to Florida Blue by the other Blue Cross and/or Blue Shield organization where the Services were provided at the amount such organization would pay non-participating providers in its geographic area for such Services.

## NORTH CAROLINA

ALLOWED AMOUNT— The maximum amount that BLUE CROSS NC determines is reasonable for
covered services provided to a member. The allowed amount includes any BLUE CROSS NC
payment to the provider, plus any deductible, coinsurance or copayment. For providers that have entered into an agreement with BLUE CROSS NC, the allowed amount is the negotiated amount that the provider has agreed to accept as payment in full. Except as otherwise specified in "Emergency Care", for providers that have not entered into an agreement with BLUE CROSS NC, the allowed amount will be the lesser of the provider's billed charge or an amount based on an out-of-network fee schedule established by BLUE CROSS NC or through the Blue Card system that is applied to comparable providers for similar services under a similar health benefit plan. Where BLUE CROSS NC has not established an out-of-network fee schedule amount for the billed service, the allowed amount will be the lesser of the provider's billed charge or an amount established by BLUE CROSS NC or through the BlueCard system using a methodology that is applied to comparable providers who may have entered into an agreement with BLUE CROSS NC for similar services under a similar health benefit plan. Other than described above, Blue Cross NC will not pay the out-of network provider's billed charge unless doing so is required in order to comply with North Carolina Statutes. Calculation of the allowed amount is based on several factors including BLUE CROSS NC's medical, payment and administrative guidelines. Under the guidelines, some procedures charged separately by the provider may be combined into one procedure for reimbursement purposes.

**SOUTH CAROLINA**

**Allowable Charge**: the amount the Corporation or a licensee of the Blue Cross and Blue Shield Association (BCBSA) agrees to pay a Participating Provider or Non-Participating Provider as payment in full for a service, procedure, supply or equipment. For a Non-Participating Provider, (i) the Allowable Charge shall not exceed the Maximum Payment and (ii) in addition to the Member's liability for Benefit Year Deductibles, Copayments and/or Coinsurance, the Member may be balance billed by the Non-Participating Provider for any difference between the Allowable Charge and the Billed Charge.

**Maximum Payment**: the maximum amount the Employer's Group Health Plan will pay (as determined by the Corporation) for a particular Benefit. The Maximum Payment will not be affected by any Credit. The Maximum Payment will be one of the following as determined by the Corporation in its discretion:

1. The actual charge submitted to the Corporation for the service, procedure, supply or equipment by a Provider;

2. An amount based upon the reimbursement rates established by the Plan Sponsor in its Benefits Checklist;

3. An amount that has been agreed upon in writing by a Provider and the Corporation or a member of the Blue Cross and Blue Shield Association;

4. An amount established by the Corporation, based upon factors including, but not limited to, (i) governmental reimbursement rates applicable to the service, procedure, supply or equipment, or (ii) reimbursement for a comparable or similar service, procedure, supply or equipment, taking into consideration the degree of skill, time and complexity involved; geographic location and circumstances giving rise to the need for the service, procedure, supply or equipment; or,

5. The lowest amount of reimbursement the Corporation allows for the same or similar service, procedure, supply or equipment when provided by a Participating Provider.

**ALABAMA**

2. **Out-of-Network Providers:** The allowed amount for care rendered by out-of-network providers is often determined by the Blue Cross and/or Blue Shield plan where services are rendered. This amount may be based on the negotiated rate payable to in-network providers or may be based on the average charge for the care in the area. In other cases, Blue Cross and Blue Shield of Alabama determines the allowed amount using historical data and information from various sources such as, but not limited to:

• The charge or average charge for the same or a similar service;

• Pricing data from the local Blue Cross and/or Blue Shield plan where services are rendered;

• The relative complexity of the service;

• The in-network allowance in Alabama for the same or a similar service;

• Applicable state healthcare factors;

• The rate of inflation using a recognized measure; and,

• Other reasonable limits, as may be required with respect to outpatient prescription drug costs.

For emergency services for medical emergencies provided within the emergency room department of an out-of-network hospital, the allowed amount will be determined in accordance with the Affordable Care Act. For services provided by an out-of-network provider, the provider may bill the member for charges in excess of the allowed amount. The allowed amount will not exceed the amount of the provider's charge.

99.    There is no language in any Blue Card plan document that has been produced for any purpose in this lawsuit that states any tangible standard for determining the amount that the plan will pay for any item, service or supply that can be billed using industry standard billing and coding conventions. The mechanism for a health plan or plan administrator to explain why a claim is denied, or grossly underpaid (meaning that the allowed amount is anything less than the charges billed for the services provided) is an explanation of benefits ("EOB"). Defendants were required to issue EOBs in conformance with 29 U.S.C. § 1133 as implemented by 29 C.F.R. 2560.503-1. Specifically, under 29 C.F.R. § 2560.503-1(g), it was required to provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1I(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant:

(i)    The specific reason or reasons for the adverse determination;

(ii)    Reference to the specific plan provisions on which the determination is based.

(iii)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)    A description of the plan's review procedures and the

time limits applicable to such procedures, including a
statement of the claimant's right to bring a civil action
under section 502(a) of the Act following an adverse
benefit determination on review;

(v)     In the case of an adverse benefit determination by a group
health plan or a plan providing disability benefit,

(vi)    If an internal rule, guideline, protocol, or other similar
criterion was relied upon in making the adverse
determination, either the specific rule, guideline,
protocol, or other similar criterion; or a statement that
such a rule, guideline, protocol, or other similar criterion
was relied upon in making the adverse determination and
that a copy of such rule, guideline, protocol, or other
criterion will be provided free of charge to the claimant
upon request; or

(vii)   If the adverse benefit determination is based on an
exclusion or limit, either an explanation of the scientific
or clinical judgment for the determination, applying the
terms of the plan to the claimant's medical
circumstances, or a statement that such explanation will
be provided free of charge upon request.

(viii)  In the case of an adverse benefit determination by a group health plan

concerning a claim involving urgent care, a description of the expedited review process applicable to such claims.

97. Strict compliance with these requirements is now necessary, and only *de minimis* errors will be excused. 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1). The errors made here by the named Blue Card plan defendants were not *de minimis*.

98. When each of the relevant claims was denied or underpaid, the Blue Card plans generated claim detail offering only vague and non-specific explanations on the EOBs for why the claims would not be properly paid. These explanations were not only vague, but were at times, seemingly nonsensical.

99. For example, in some cases the EOB's explained that certain claims would not be properly paid because the "Charge exceeds fee schedule," even though there was no contract with a fee schedule governing the claim(s) at issue. The Blue Card plans' EOBs also frequently included statements referencing a "legislated fee arrangement" when there was none.

100. The Blue Card plans' EOBs did not comply with ERISA regulations, including not stating the specific and/or actual reasons for its failure to pay claims at the rate based on the express terms of an ERISA plan. The Blue Card plans' EOBs also failed to provide details required by law or offer to provide more information if needed, as required by law.

101. Patients and Windmill are informed and believe that in many, if not all cases, the health plans at issue in this case required the Blue Card plans and their clients, (the sponsoring employers), to reimburse Windmill at its usual, customary and reasonable

rates for its services to the ERISA plan participants and beneficiaries, or alternatively, pursuant to plan provisions that were not followed, resulting in greater personal costs to Patients.

102.   Patients and Windmill allege that the Blue Card plans do not merely breach applicable plan provisions. The Blue Card Defendants have become so sophisticated over time that they have adopted systemic methods that make it quite difficult to determine what their obligations are to plan participants, beneficiaries, employers and medical care providers. Nonetheless, it remains patently obvious, and can be shown with appropriate forms of discovery, that the named Defendants are purposefully tendering what are, or are very, very close to *de minimis* reimbursement amounts to out-of-network providers and that these practices are not in compliance with the terms of the plans, or the tenets of ERISA and the regulations of the U.S. Department of Labor thereunder.

103.    Patients and Windmill also allege that the applicable Mental Health Parity Laws have not been followed by most, and possibly all named Defendants.

104.   As a result of the Blue Card plans' underpayment of plan benefits, Patients are entitled to recover under 29 U.S.C. § 1132(a)(1)(B) for the difference between what should have been paid and the amounts that were actually paid, if any, plus applicable pre and post judgment interest and reasonable attorneys' fees at the discretion of the Court.

107.   Patients and Windmill assert  actual damages in this action are  in excess of $5,000,000.00 and can be more precisely calculated when Patients  are able to secure complete plan documents and conduct further discovery  as to the Blue Card plan organizations, the  plan sponsors and others that are in possession, custody and control of

the information sought during pre-trial discovery.

## XII.
## COUNT TWO:
## STATE LAW CLAIMS
## <u>FOR BREACH OF CONTRACT</u>

108.   Patients and Windmill incorporate by reference the allegations set forth in paragraphs one  (1) through ninety-one (91) above, as if fully set forth here verbatim as to its state law claims as pleaded below.

109.   The claims made the basis of this Plaintiff's Fifth Amended Original Complaint are contained in Plaintiffs'  Exhibits 1 through 18, attached hereto. Demographic information fully identifying Patients  not intended for the public has been redacted from Plaintiffs' Exhibits 1 – 18.   Unredacted versions of these exhibits will be shared with counsel and the Court as needed.

110.  The cause of action pleaded here is intended to apply to those employers or individuals that purchased health insurance plans and/or other administrative services from a Blue Card plan in connection with products and services provided to such employers and/or individuals <u>not subject to ERISA</u>.

111.   As described above, the Blue Card plans authorized medical services and necessarily agreed to pay for such services provided by Windmill to Patients. All such per5sons named herein as Patients are, or were at all times relevant to this action, insured individuals and/or beneficiaries of health plans and/or health insurance policies of Blue Card organizations and related plan sponsors that were sold and issued to individuals or employers exempt from treatment under ERISA. In advance of providing services to

members of Blue Card plan members' non-ERISA plans, Windmill contacted Blue Card plans to verify that coverage was available and obtain any required authorization for the proposed services. If current coverage was confirmed and an authorization to render medical care was provided by the applicable Blue Card plan, services were provided. The Blue Card plans named in this Plaintiff's Fifth Amended Original Complaint have each failed to correctly calculate and tender reimbursement for services required for the treatment of mental health and/or substance abuse disorders. Such services were rendered by Windmill to Patients. These plans' non-performance in failing to reimburse at all or per the terms of the applicable plans and policies constitutes a breach of the express terms of the policy or plan documents. Alternatively, the parties entered into an implied-in-fact contractual agreement, which can be inferred from the industry standards described above, the parties conduct, and the surrounding circumstances involved for these multiple admissions of the Blue Card plans' members, named herein as Patients.

112.    Windmill alleges that the named Blue Card plans have not followed the terms of the policesand plans they sold, issued and administered, and that as a result of the breach of the express terms of plans and policies by these Blue Card plans, Patients and Windmill have been damaged in the amount of the balance of its usual and customary charges, in an aggregate amount of not less than $5,000,000.00, for which which Patients sue the Blue Card plans named herein.

113.   Patients and Windmill will show that its actual damages exceed the sum of $5,000,000.00 and can be more precisely calculated when Patients and Windmill are able to secure plan documents and other relevant disclosures from the Blue Card plan

organizations and plan sponsors through pre-trial discovery. Patients and Windmill seek recovery of actual damages, taxable costs of court, reasonable attorneys' fees and pre and post judgment interest at the highest legal rate.

## JURY DEMAND

114.    Patients and Windmill requests a trial by jury of all issues and causes of action so triable pursuant to the Federal Rules of Civil Procedure.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Patients and Windmill Wellness Ranch LLC requests that the Blue Card plans named as defendants within this Plaintiff's Fifth Amended Original Complaint be summoned to appear and answer herein; and after hearing this cause on the merits, the Court enter judgment in favor of Patients and Windmill Wellness Ranch, LLC and against the Blue Card plans in the amounts determined as appropriate sums of payment from each defendant by the Court, the following relief :

A.    Judgment for actual damages in the amount of not less than the amounts, as determined to be payable per the health insurance policies and plans of the insured employers and individuals, or alternatively, in an amount determined by the Court to represent the Usual, Customary and Reasonable charges for the services provided to Patients that received services at Windmill, and whose claims were adjudicated by one or more of the named defendants; and,

B.    All taxable costs of Court;

C.    Attorney's fees to be determined by the trier of fact, all taxable costs of court;

D.    Pre and post judgment interest at the highest legal rate; and,

E.    Such other and further relief to which all plaintiffs herein may show themselves to be justly entitled.

Respectfully submitted,

LAW OFFICES OF P. MATTHEW O'NEIL

By:    /s/ P. Matthew O'Neil_____
          P. MATTHEW O'NEILState
          Texas Bar No. 00795955
          6514 McNeil Dr.
          Bldg. 2, Suite 201
          Austin, Texas 78729
          (512) 473-2002 Telephone
          (512) 473-2034 Facsimile
          moneil@mattoneillaw.com


HOLLAWAY PC

By:    /s/  T. Daniel Hollaway_____
          T. Daniel Hollaway
          Texas Bar No.: 09866700
          19 Briar Hollow Lane, Suite 230
          Houston, Texas 77027
          Telephone: (713) 942.7900
          Facsimile:  (713) 942.8530
          dhollaway@houstonlaw.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 19, 2022, I served a true and correct copy of the above and foregoing Plaintiff's Fifth Amended Original Complaint, with attached Exhibits, electronically to all counsel of record. Notice of the filing will be sent by operation of the Court's PACER electronic filing system to all counsel of record.


By    /s/ T. Daniel Hollaway